# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PLL TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 14-942 (LPS) (CJB) |
| | ) | |
| ALTERA CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| PLL TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 14-943 (LPS) (CJB) |
| | ) | |
| MICROSEMI SOC CORP. | ) | |
| | ) | |
| Defendant. | ) | |
| PLL TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 14-945 (LPS) (CJB) |
| | ) | |
| XILINX, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## [PROPOSED] STIPULATED PROTECTIVE ORDER

Plaintiff PLL Technologies, Inc. ("Plaintiff" or "PLL") and Defendants Altera Corporation ("Altera"), Microsemi SoC Corporation ("Microsemi"), and Xilinx, Inc. ("Xilinx") (collectively, "Defendants"), recognize that information and materials sought, produced, and/or exhibited in this matter by the Parties or produced by third parties may contain confidential, proprietary, and/or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this action would be warranted.

To expedite the flow of discovery material, to facilitate prompt resolution of disputes over confidentiality of discovery materials, to adequately protect information the Parties are entitled to keep confidential, to ensure only materials entitled to such confidentiality are subject to confidential treatment, and to ensure the Parties are permitted reasonably necessary use of such materials in preparation for and during trial, the Parties hereby stipulate to the following protective order and pursuant to Federal Rule of Civil Procedure 26(c), **IT IS HEREBY ORDERED THAT:**

1. **PURPOSES AND LIMITATIONS**

1.1    This Protective Order ("Protective Order") is intended to protect confidential, proprietary, and/or private information for which special protection from public disclosure is permitted that is likely to be produced or disclosed in this action. The Parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords extends only to the limited information or items that are entitled to confidential treatment under applicable legal principles.

1.2    To the extent that any Producing Party in this litigation provides Protected

2

Material under the terms of this Protective Order to a Receiving Party, the Receiving Party shall not share that material with any other Party in this litigation, absent a further Court order or express written permission (including through email) from the Producing Party or its counsel. This Order does not confer any right to any one Defendant to access the Protected Material of any other Defendant.

      2.      **<u>DEFINITIONS</u>**

      2.1     <u>"CONFIDENTIAL" Information or Items:</u> Confidential information (regardless of how generated, stored, or maintained) or tangible things that the Designating Party (i) would not normally reveal to third parties except in confidence, or has undertaken with others to maintain in confidence, (ii) believes in good faith is significantly sensitive, or (iii) protected by a right to privacy under federal or state law or any other applicable privilege or right related to confidentiality or privacy.

      2.2     <u>Counsel (without qualifier)</u>: Outside Counsel or In-House Counsel and all support staff thereof.

      2.3     <u>Designating Party</u>: A Party or non-party that designates information or items that it produces in Disclosure or Discovery Material as "CONFIDENTIAL", "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY", or "HIGHLY CONFIDENTIAL – SOURCE CODE."

      2.4     <u>Disclosure of Discovery Material</u>: All items or information, regardless of the medium or manner generated, stored, or maintained (including, among other things, testimony, transcripts, or tangible things) that are produced, generated, or otherwise provided in this action by the Parties or by non-parties.

      2.5     <u>Expert</u>: A person who has been retained by a Party or its Counsel to serve as an

expert witness or as a consulting expert in this action and who is not a current officer, director, or employee of a Party or of a competitor of a Party and who, at the time of retention, does not anticipate becoming an officer, director or employee of a Party or of a competitor of a Party. Nothing in this order purports to change the requirements for offering testimony under Fed. R. Evid. 703, or to define the term "expert" for purposes other than those addressed in this Protective Order.

2.6     "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items: "CONFIDENTIAL" Information (as defined in 2.1 above) that the Designating Party believes in good faith is not generally known to others and has significant competitive value such that unrestricted disclosure to another Party or non-party would create a substantial risk of harm to the competitive position of the Producing Party.

2.7     "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items: "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items representing computer code and associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.8     In-House Counsel: Attorneys who are employees of a Party, or attorneys who are independent contractors of a Party and provide legal advice on an exclusive basis to that Party.

2.9     Outside Counsel: Attorneys who are not employees of a Party but who are retained to represent or advise a Party in this action.

2.10    Party: Any Party to this action, including all of its officers, directors, employees,

4

consultants, retained experts, and all support staff thereof.

2.11    Producing Party: A Party or non-party that discloses or produces Disclosure or Discovery Material in this action.

2.12    Professional Vendors: Persons or entities that provide litigation support services *(e.g.,* photocopying; videotaping; translating; electronically stored information (ESI) consulting or document management; preparing exhibits or demonstrations; document management; jury consulting; mock trial coordination) and their employees and subcontractors (including, but not limited to, mock jurors).

2.13    Protected Material: Any Disclosure or Discovery Material that is designated as "CONFIDENTIAL", "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY", or "HIGHLY CONFIDENTIAL – SOURCE CODE" as provided for in this Order.

2.14    Receiving Party: A Party that receives Disclosure or Discovery Material from a Producing Party in this action.

3.    **SCOPE**

3.1    The protections conferred by this Order cover not only Protected Material (as defined above), but also any information copied or extracted from Protected Material, as well as copies, excerpts, summaries, or compilations thereof, and testimony, conversations, or presentations by a Party or Counsel to or in court or in other settings that might reveal Protected Material.

4.    **DURATION**

4.1    Even after the termination of this action, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees or a court order directs otherwise.

4.2     This Order shall be binding upon the Parties and their attorneys, successors, executors, personal representatives, administrators, heirs, legal representatives, assigns, subsidiaries, divisions, employees, agents, independent contractors, experts, consultants, and all other persons or organizations over which the Parties have control.

5.      **DESIGNATING PROTECTED MATERIAL**

5.1     <u>Manner and Timing of Designations</u>: Except as otherwise provided in this Order or as otherwise stipulated or ordered, material that a Designating Party believes in good faith qualifies for protection under this Order must be so designated before the material is disclosed or produced. Designation in conformity with this Order shall be made as follows:

(a)     <u>For Information in documentary (including "electronically stored information")</u> form (apart from transcripts of depositions or other pretrial or trial proceedings) the Designating Party shall affix the legend "CONFIDENTIAL", "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY", or "HIGHLY CONFIDENTIAL – SOURCE CODE" conspicuously on each page that contains Protected Material.

A Party or non-party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied or produced. Before and during the inspection, all material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must, within five (5) business days of the inspection, determine which documents, or portions thereof, qualify for protection under this Order and, before producing the specified documents, the Producing Party must affix the appropriate legend to each page that contains Protected Material.

(b)    <u>For testimony given in deposition or in other pretrial or trial proceedings</u>

the Designating Party shall specify any portions of the testimony that it wishes to designate no

later than 10 business days after the final transcript of the deposition or other proceeding has

been received.  For deposition transcripts, the Party or non-party may identify that portion of a

transcript that it believes in good faith qualifies protection under this Order    as

"CONFIDENTIAL", "HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY", or

"HIGHLY CONFIDENTIAL - SOURCE CODE" but all deposition transcripts not designated

during the deposition will nonetheless be treated as "CONFIDENTIAL - ATTORNEYS' EYES

ONLY" until the time within which it may be appropriately designated as provided for herein

has passed. Any Protected Material that is used in the taking of a deposition shall remain subject

to the provisions of this Protective Order, along with the transcript pages of the deposition

testimony dealing with such Protected Material. In such cases the court reporter shall be

informed of this Protective Order and shall be required to operate in a manner consistent with

this Protective Order. In the event the deposition is videotaped, the original and all copies of the

videotape shall be marked by the video technician to indicate that the contents of the videotape

are subject to this Protective Order, substantially along the lines of "This videotape contains

confidential testimony used in this case and is not to be viewed or the contents thereof to be

displayed or revealed except pursuant to the terms of the operative Protective Order in this

matter or pursuant to written stipulation of the parties." Counsel for any Designating Party shall

have the right to exclude from oral depositions, other than the deponent, deponent's counsel, the

reporter and videographer (if any), any person who is not authorized by this Protective Order to

receive or access Protected Material based on the designation of such Protected Material. Such

right of exclusion shall be applicable only during periods of examination or testimony regarding

such Protected Material.

(c)     For information produced in some form other than documentary, and for any other tangible items, the Designating Party shall affix, in a prominent place on the exterior of the medium, container or containers in which the information or item is stored, the appropriate legend.

5.2     Inadvertent Failure to Designate Properly: An inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon discovery of an inadvertent failure to designate, a Producing Party may notify the Receiving Party in writing that the material is to be designated. Upon receipt of such notice, the Receiving Party must make reasonable efforts to assure that the material is thereafter treated in accordance with the provisions of this Order. The Designating Party shall provide substitute copies of documents bearing the confidentiality designation. Upon receiving substitute copies, the Receiving Parties shall return or securely destroy, at the Designating Party's option, all material that was not designated properly.

6.     **CHALLENGING CONFIDENTIALITY DESIGNATIONS**

6.1     Timing of Challenges: A Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2     Meet and Confer: A Party that elects to initiate a challenge to a Designating Party's confidentiality designation must do so in good faith and must begin the process by identifying, in writing, the documents or information that the challenging Party contends should be differently designated, and the basis for its belief that the confidentiality designation is

8

improper. The Designating Party shall, within seven (7) calendar days after receiving such written notice, advise the challenging party, in writing, of the basis for its designation or re-designation. Within seven (7) calendar days thereafter, the parties shall meet and confer directly in good faith to resolve the matter.

6.3     Judicial Intervention: A Party that elects to challenge a confidentiality designation after considering the justification offered by the Designating Party (as described in the preceding section) may, within seven (7) days of the parties' meet-and-confer, seek the Court's assistance in resolving the dispute in accordance with the Court's discovery dispute procedures. The burden shall be on the Designating Party to justify its asserted confidentiality designation.

7.     **ACCESS TO AND USE OF PROTECTED MATERIAL**

7.1     Basic Principles: A Receiving Party may use Protected Material that is disclosed or produced by a Producing Party or non-party in connection with this action only for prosecuting, defending, or attempting to settle this action, and not any other purpose, including any reexamination or other post grant proceedings involving the patent-in-suit. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When this action has been terminated, a Receiving Party must comply with the provisions of Section 10 (FINAL DISPOSITION), below.

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures access to the Protected Material is limited to the persons authorized under this Order.

7.2     Procedures for Disclosure and Review of Material Designated 'HIGHLY CONFIDENTIAL – SOURCE CODE." Information or Items designated "HIGHLY

CONFIDENTIAL – SOURCE CODE" (as defined in Section 2.7) will be made available for review at the following locations: (1) For Altera, Morrison & Foerster LLP, 755 Page Mill Road, Palo Alto, CA 94304, or at any location mutually agreed to by Plaintiff and Altera; (2) For Xilinx, Jones Day, 1755 Embarcadero Road, Palo Alto, CA 94303, or at any location mutually agreed to by Plaintiff and Xilinx; and (3) For Microsemi, Lee Tran & Liang LLP, 2 Park Plaza, Suite 720, Irvine, CA 92614, or at any location mutually agreed to by Plaintiff and Microsemi. The following conditions shall govern the production, review, and use of Information or Items designated "HIGHLY CONFIDENTIAL – SOURCE CODE" ("SOURCE CODE") and shall displace all such procedures and conditions set forth in the Delaware Default Standard For Access to Source Code in their entirety:

(a)    Upon reasonable notice by the Receiving Party of no less than three (3) business days, all Information or Items designated "HIGHLY CONFIDENTIAL - SOURCE CODE" will be made available for review between 8:00 am and 6:00 pm, and any other time that is reasonable under the circumstances, by the Producing Party to the Receiving Party's outside Counsel and/or Experts in a secured room on a secured computer at the following locations: (1) For Altera, Morrison & Foerster LLP, 755 Page Mill Road, Palo Alto, CA 94304, or at any location mutually agreed to by Plaintiff and Altera; (2) For Xilinx, Jones Day, 1755 Embarcadero Road, Palo Alto, CA 94303, or at any location mutually agreed to by Plaintiff and Xilinx; and (3) For Microsemi, Lee Tran & Liang LLP, 2 Park Plaza, Suite 720, Irvine, CA 92614, or at any location mutually agreed to by Plaintiff and Microsemi or alternatively, via a remotely accessible secured computer, as necessary and appropriate to prevent and protect against any unauthorized copying, transmission, removal, or other transfer of any information outside or away from the computer on which the information is provided for inspection (the

10

"Computer"). To the extent review of SOURCE CODE information is reasonably necessary for trial, the Parties shall negotiate in good faith, during the pre-trial phase of the case, the location of and conditions for access and review of SOURCE CODE information. The Producing Party shall install reasonable tools or programs on the Computer to allow the Receiving Party to review and search the SOURCE CODE information if such tools exist and are presently used in the ordinary course of the Producing Party's business. If the Receiving Party requires additional program(s) or review tool(s) or any particular type of program or review tool in addition to the reasonable tools or programs provided by the Producing Party, the Requesting Party shall provide (at the Receiving Party's cost) a licensed copy of the additional program(s) or review tool(s) to the Producing Party in reasonable advance of the inspection.

(b)      The Receiving Party's outside counsel and/or Experts shall be entitled to take notes relating to the SOURCE CODE information, but may not copy the SOURCE CODE information into the notes. Such notes shall be subject to the provisions of section (g) below. No copies of all or any portion of the SOURCE CODE information may leave the room in which the information is inspected unless otherwise provided herein. Furthermore, no other written or electronic record of the SOURCE CODE information is permitted except as otherwise provided herein.

(c)      The Producing Party shall make available a printer with commercially reasonable printing speeds for on-site printing during inspection of the SOURCE CODE information or in the alternative at the Producing Party's discretion, provide a mechanism by which the Receiving Party may designate certain portions of the information for production by the Producing Party. The Receiving Party may print limited portions (or designate portions for production by the Producing Party) of the SOURCE CODE information only when necessary to

11

prepare any filing with the Court or to serve any pleadings or other papers on any other Party (including a testifying expert's expert report). The Receiving Party shall print or designate for production only such portions as are reasonably necessary for the purposes for which any part of the SOURCE CODE information is printed or designated for production at the time, but shall not request paper copies for the purpose of reviewing SOURCE CODE information in the first instance. In no event may the Receiving Party print or designate for production more than 40 consecutive pages and no more than 2000 pages of information in aggregate per Defendant during the duration of the case without prior written consent by the Producing Party, which will not be unreasonably withheld, or leave of Court.

Upon printing any such portions of SOURCE CODE information, the printed pages shall be collected by the Producing Party. The Producing Party shall Bates number, copy, and label "HIGHLY CONFIDENTIAL - SOURCE CODE" any pages printed or designated for production by the Receiving Party. Within five (5) business days, the Producing Party shall either (i) send one copy set of such pages to the Receiving Party, for next day business delivery, or (ii) inform the Receiving Party that it objects that the printed or designated portions are excessive and/or not done for a permitted purpose. If, after meeting and conferring, the Producing Party and the Receiving Party cannot resolve the objection, either party shall be entitled to seek Court intervention to resolve the dispute. The burden shall be on the Producing Party to demonstrate that such printed or designated portions are more than reasonably necessary for a permitted purpose and not merely printed or designated for production for the purposes of review and analysis elsewhere.

(d)     A list of names of persons who will view the SOURCE CODE

information will be provided to the Producing Party in conjunction with any written (including email) notice requesting inspection, and in no event later than four (4) days in advance of such inspection. The Receiving Party in cooperation with the Producing Party shall maintain a daily log of the names of persons who enter the locked room to view the SOURCE CODE information and when they enter and depart. The Producing Party shall be entitled to have a person observe from a distance the activities of the Receiving Party's representatives during any such review, but only to ensure that such activities are permitted under this Order, and to receive a copy of the log. The Producing Party shall not, however, be allowed to monitor the conduct of the Receiving Party in such a manner as to obtain information that would otherwise be protected from disclosure by the Receiving Party's claim of attorney-client privilege, the work product immunity, or any other privilege, doctrine, right, or immunity.

(e)     Unless otherwise agreed in advance by the Parties in writing, following each inspection, the Receiving Party's outside counsel and/or Experts shall remove all notes, documents, and all other materials from the review room. The Producing Party shall not be responsible for any items left in the room following each inspection session.

(f)     Other than as provided in section (c) above, the Receiving Party shall not copy, remove, or otherwise transfer any information from the Computer including, without limitation, copying, removing, or transferring the information onto any other computers, peripheral equipment, storage devices, or storage media. The Receiving Party will not transmit any "HIGHLY CONFIDENTIAL - SOURCE CODE" information in any way from the Producing Party's facilities or the offices of its Outside Counsel of record.

(g)     The Outside Counsel and Experts (who have been approved to access

13

information under Sections 7.4-7.6) for a Receiving Party shall maintain and store any paper copies of the SOURCE CODE information or notes related to such SOURCE CODE information (as referenced in section (b) above) at their offices in a manner that prevents duplication of or unauthorized access to the information or notes, including, without limitation, storing the SOURCE CODE information or notes in a locked room or cabinet at all times when those materials are not in use.

(h)    The Receiving Party's Outside Counsel of record may make no more than five additional paper copies of any portions of the SOURCE CODE information printed or designated for production pursuant to Section 7.2(c), not including copies attached to court filings, copies used at depositions, or copies made by Outside Counsel for the purposes of drafts, etc. The Receiving Party's Outside Counsel of record shall maintain a log of all copies of the information (received from a Producing Party) that are provided by the Receiving Party to any qualified person under Section 7.5(b)-(i). The log shall include the names of the recipients and reviewers of copies and locations where the copies are stored. Any paper copies of information shall be designated "HIGHLY CONFIDENTIAL - SOURCE CODE" and shall be stored or viewed only at (i) the offices of Outside Counsel for the Receiving Party, (ii) the offices of Experts who have been approved to access information under Section 7.6, (iii) the site where any deposition is taken, (iv) the Court, or (v) any intermediate location necessary to transport the information to a hearing, trial, or deposition. Any such paper copies shall be maintained at all times in a locked and secure location. The Producing Party shall not unreasonably deny a Receiving Party's request to make (and log) additional copies, providing that the request is for good cause and for use that otherwise complies with this order. The Producing Party shall be entitled to a copy of the log upon request, but the Producing Party may

14

only request such a log one time per month and at the conclusion of the litigation. If the Producing Party believes in good faith that there has been access to HIGHLY CONFIDENTIAL - SOURCE CODE information not in compliance with this Order, the Parties shall meet and confer to address and resolve the concern. If, after meeting and conferring the Parties cannot resolve the concern, the Producing Party shall be entitled to seek a Court resolution of whether there has been access to HIGHLY CONFIDENTIAL - SOURCE CODE information not in compliance with this Order. The burden shall be on the Producing Party to demonstrate that there has been access to HIGHLY CONFIDENTIAL - SOURCE CODE information not in compliance with this Order.

(i)     The Receiving Party may include excerpts of information in a pleading, exhibit, expert report, discovery document, deposition transcript, other Court document, or any drafts of these documents ("SOURCE CODE"). The Receiving Party shall only include such excerpts as are reasonably necessary for the purposes for which such part of the information is used. To the extent portions of information are quoted from SOURCE CODE, either (i) the entire document will be stamped HIGHLY CONFIDENTIAL – SOURCE CODE, or (ii) those pages containing quoted information will be separately bound, and stamped as HIGHLY CONFIDENTIAL – SOURCE CODE. All SOURCE CODE shall be filed under seal. Copies of SOURCE CODE information that are marked as deposition exhibits shall not be provided to the court reporter or attached to deposition transcripts; rather, the deposition record will identify the exhibit by its production numbers.

(j)     All paper copies of SOURCE CODE shall be securely destroyed if they are no longer necessary in the litigation (e.g., extra copies at the conclusion of a deposition).

15

(k)     The Receiving Party may only create an electronic copy or image (e.g., a scan of the information to a PDF, or a photograph of a document) of selected portions of the SOURCE CODE information and only when reasonably necessary to accomplish any filing with the Court or to serve any pleadings or other papers on any other Party (including expert reports). Images or copies of information shall not be included in correspondence between the Parties (references to production numbers shall be used instead) and shall be omitted from pleadings and other papers except to the extent permitted herein.

7.3     <u>Disclosure of "CONFIDENTIAL" Information or Items:</u> Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "CONFIDENTIAL" only to:

(a)     The Receiving Party's Outside Counsel of record in this action, as well as employees of said Outside Counsel to whom disclosure is reasonably necessary to conduct this action (by executing this Order, Outside Counsel acknowledges the obligation on behalf of all employees of Outside Counsel to abide by the terms and conditions of the Order and will appropriately disclose these terms and conditions to all employees who will have access to information pursuant to the Order);

(b)     The officers, directors, employees, or consultants, whether full or part time (including In-House Counsel) of the Receiving Party to whom disclosure is reasonably necessary to conduct this action, who have signed the "Acknowledgement and Agreement to Be Bound by Stipulated Protective Order" (attached hereto as Exhibit A) and provided an executed copy to all Parties prior to receiving Protected Material, and for which no unresolved objections to such disclosure exist after compliance with a procedure conforming to the requirements set out in Section 7.6 below;

16

(c)     Experts (as defined in Section 2.5, above) of the Receiving Party to whom disclosure is reasonably necessary to conduct this action and who have signed the "Acknowledgement and Agreement to Be Bound by Stipulated Protective Order" (Exhibit A) and for which no unresolved objections to such disclosure exist after compliance with the requirements set out in Section 7.6 below. Without the express prior written consent of the Defendant that produced the Protected Material, no expert or consultant retained by a Defendant in this matter shall have access to "CONFIDENTIAL" material produced by another Defendant in this matter.

(d)     The Court and its personnel;

(e)     Any designated arbitrator or mediator who is assigned to hear this matter, or who has been selected by the Parties, and his or her staff, who have signed the "Acknowledgement and Agreement to Be Bound by Stipulated Protective Order" (Exhibit A);

(f)     Court reporters and videographers employed in connection with this case;

(g)     Professional Vendors to whom disclosure is reasonably necessary to conduct this action and a representative of which has signed the "Acknowledgement and Agreement to Be Bound by Stipulated Protective Order" (Exhibit A), provided, however, that copy vendors (such as Parcels, Inc.) shall not be required to sign Exhibit A;

(h)     Persons who appear on the face of the Protected Material as an author, addressee, or recipient of the document or have prior knowledge of the Protected Material as established through testimony;

(i)     During deposition and/or at trial, current employees of the Producing Party that produced the documents or information, and any other witnesses, provided that such witnesses may not retain copies of Protected Material unless permitted by other provisions of this

Order; and

(j)     Any other person with the prior written consent of the Producing Party.

7.4     Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY"

Information or Items: Unless otherwise ordered by the Court or permitted in writing by the

Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY

CONFIDENTIAL - ATTORNEYS' EYES ONLY" only to:

(a)     The Receiving Party's Outside Counsel of record in this action, as well as

employees of said Outside Counsel to whom disclosure is reasonably necessary to conduct this

action (by executing this Order, Outside Counsel acknowledges the obligation on behalf of all

employees of Outside Counsel to abide by the terms and conditions of the Order, and will make

appropriate disclosure of these terms and conditions to all employees who will have access to

information pursuant to the Order);

(b)     Experts (as defined in Section 2.5, above) of the Receiving Party to whom

disclosure is reasonably necessary to conduct this action and who have signed the

"Acknowledgement and Agreement to Be Bound by Stipulated Protective Order" (Exhibit A) and

provided an executed copy to all Parties prior to receiving Protected Material and for which no

unresolved objections to such disclosure exist after compliance with the requirements set out in

Section 7.6 below. Without the express prior written consent of the Defendant that produced the

Protected Material, no expert or consultant retained by a Defendant in this matter shall have

access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" material produced by

another Defendant in this matter;

(c)     The Court and its personnel;

(d)     Any designated arbitrator or mediator who is assigned to hear this matter,

18

or who has been selected by the Parties, and his or her staff, who have signed the "Acknowledgement and Agreement to Be Bound by Stipulated Protective Order" (Exhibit A);

(e)     Court reporters and videographers employed in connection with this case;

(f)     Professional Vendors to whom disclosure is reasonably necessary to conduct this action and a representative of which has signed the "Acknowledgement and Agreement to Be Bound by Stipulated Protective Order" (Exhibit A), provided, however, that copy vendors (such as Parcels, Inc.) shall not be required to sign Exhibit A;

(h)     Persons who appear on the face of the Protected Material as an author, addressee, or recipient of the document or have prior knowledge of the Protected Material as established through testimony; and

(i)     During depositions, current employees of the Producing Party that produced the documents or information. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Information must be separately bound by the court reporters and may not be disclosed to anyone except as permitted under this Order.

(j)     Any other person with the prior written consent of the Producing Party.

7.5     <u>Disclosure of "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items</u>: Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party may disclose any information or item designated "HIGHLY CONFIDENTIAL – SOURCE CODE" in accordance with the provisions of Section 7.2 of this Order and only to:

(a)     The Receiving Party's Outside Counsel of record in this action, as well as employees of said Outside Counsel to whom disclosure is reasonably necessary to conduct this action (by executing this Order, Outside Counsel acknowledges the obligation on behalf of all employees of Outside Counsel to abide by the terms and conditions of the Order, and will make

appropriate disclosure of these terms and conditions to all employees who will have access to information pursuant to the Order);

(b)     Experts (as defined in Section 2.5, above) of the Receiving Party to whom disclosure is reasonably necessary to conduct this action and who have signed the "Acknowledgement and Agreement to Be Bound by Stipulated Protective Order" (Exhibit A) and provided an executed copy to all Parties prior to receiving Protected Material and for which no unresolved objections to such disclosure exist after compliance with the requirements set out in Section 7.6 below. Without the express prior written consent of the Defendant that produced the Protected Material, no expert or consultant retained by a Defendant in this matter shall have access to "HIGHLY CONFIDENTIAL – SOURCE CODE" material produced by another Defendant in this matter;

(c)     The Court and its personnel;

(d)     Any designated arbitrator or mediator who is assigned to hear this matter, or who has been selected by the Parties, and his or her staff, who have signed the "Acknowledgement and Agreement to Be Bound by Stipulated Protective Order" (Exhibit A);

(e)     Court reporters and videographers employed in connection with this case;

(f)      Professional Vendors to whom disclosure is reasonably necessary to conduct this action and a representative of which has signed the "Acknowledgement and Agreement to Be Bound by Stipulated Protective Order" (Exhibit A), provided, however, that copy vendors (such as Parcels, Inc.) shall not be required to sign Exhibit A;

(g)     Persons who appear on the face of the Protected Material as an author, addressee, or recipient of the document or have prior knowledge of the Protected Material as established through testimony; and

(h)     During depositions, current employees of the Producing Party that produced the documents or information. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Information must be separately bound by the court reporters and may not be disclosed to anyone except as permitted under this Order.

(i)     Any other person with the prior written consent of the Producing Party.

7.6     Procedures for Approving Disclosure of Protected Material to Experts:

(a)     A Party that seeks to disclose to an Expert any information or item that has been designated "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" and "HIGHLY CONFIDENTIAL – SOURCE CODE" first must notify, in writing (including via email), the Designating Party of its intent to make such a disclosure. The notification shall include a copy of the Expert's current *curriculum vitae* and must identify:

(i)     The full name and business address of the Expert;

(ii)     The Expert's current employer(s);

(iii)     Each person or entity from whom the Expert has received compensation for work in his/her area of expertise or to whom the expert has provided professional services in his/her area of expertise at any time during the preceding four (4) years;

(iv)     Any legal action (by name and number of the case, filing date, and court) in connection with which the Expert has provided any professional services in his/her area of expertise during the preceding four (4) ; and

(v)     Any previous or current contractual relationship with any of the Parties.

The Party that seeks to make such disclosure to an expert of any information or item that has been designated Protected Material need not identify to the Designating Party said information or item to be disclosed.  Confidential employment or consulting relationships of an

21

Expert may be disclosed as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information under the terms of this Order.

(b)     A Party that provides the notice described in the preceding section may disclose the subject Protected Material to the identified Expert unless, within seven (7) days of receipt of the notice, the Party receives an objection to the disclosure, in writing (including via email), from the Designating Party. Any such objection must be for good cause and must set forth in detail the grounds on which it is based. In the absence of an objection at the end of the seven (7) day period, the Expert shall be deemed approved under this Protective Order.

(c)     A Party that receives a timely written objection as described in the preceding section must meet and confer with the Designating Party to try to resolve the matter by agreement within seven (7) days following the objection. Only if no agreement is reached after the meet and confer, either party may seek the Court's assistance in accordance with the Court's procedures for resolving discovery disputes within seven (7) days from the date of the meet and confer. If relief from the Court is not sought within that time, the objection shall be deemed withdrawn. If relief is sought, designated material shall not be disclosed to the Expert in question until the Court resolves the objection. In any such proceeding, the Party opposing disclosure to the Expert shall bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to the specific designated Expert.

(d)     An initial failure to object to an expert under this section shall not preclude the non-objecting party from later objecting to continued access by that Expert for good cause.

8.     **FILING PROTECTED MATERIAL**

8.1     All Protected Material must be filed under seal in accordance with the provisions

of the United States District Court for the District of Delaware's Revised Administrative Procedures Governing Filing and Service by Electronic Means.

9.     **USE OF PROTECTED MATERIAL AT COURT HEARINGS OR PROCEEDINGS**

9.1     The use of Protected Material at any Court hearing or proceeding shall be as directed by the Court.

9.2     In the event that any material designated as Protected Material is used in any Court hearing or proceeding, the Party proffering the Protected Material may request that the Court close the courtroom, but the decision of whether to do so rests with the judge presiding at the hearing or proceeding.

10.     **FINAL DISPOSITION**

10.1     Unless otherwise ordered or agreed in writing by the Producing Party, within twenty-one (21) days after the final termination of this action, including all appeals (or 21 days after the time to appeal has lapsed), each Receiving Party must destroy or return, at the Producing Party's request, all Protected Material to the Producing Party. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, or any other form of reproducing or capturing any of the Protected Material. The Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the twenty-one (21) day deadline.

10.2     Notwithstanding the preceding section, Counsel for Defendants are entitled to retain an archival copy of all pleadings, motion papers, transcripts, legal memoranda, expert reports, correspondence, or attorney work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION), above.

11. **PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION**

11.1    If a Receiving Party is served with a subpoena or an order issued in other action that would compel disclosure of any Protected Material, the Receiving Party must so notify the Designating Party, in writing immediately so that the Designating Party has an opportunity to object to the disclosure of Protected Material. Such notification must include a copy of the subpoena or court order.

11.2    The Receiving Party also must immediately inform in writing the Party who caused the subpoena or order to issue in the other action that some or all the material covered by the subpoena or order is the subject of this Order. In addition, the Receiving Party must deliver a copy of this Order promptly to the Party that caused the subpoena or order to issue in the other action.

11.3    The purpose of imposing this duty is to afford the Designating Party in this action an opportunity to try to protect its confidentiality interests in the court from which the subpoena or order issued. The Designating Party shall bear the burdens and the expenses of seeking protection of its confidential material in that court.

11.4    Nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

11.5    By entering this order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or party subject to this order who becomes subject to a motion to disclose another Party's information designated "CONFIDENTIAL", "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY", or "HIGHLY CONFIDENTIAL – SOURCE CODE" pursuant to this order shall promptly notify that party of the motion so that

24

the party may have an opportunity to appear and be heard on whether that information should be disclosed.

### 12.   UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

12.1    If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Order, the Receiving Party must immediately: (a) notify the Designating Party, in writing, of the unauthorized disclosure(s); (b) use its best efforts to retrieve all copies of the Protected Material; (c) inform the person(s) to whom unauthorized disclosures were made of all the terms of this Order; and (d) request that such person(s) execute the "Acknowledgement and Agreement to Be Bound by Stipulated Protective Order" (Exhibit A).

### 13.   LIMITATIONS ON PATENT PROSECUTIONS AND REEXAMINATIONS

13.1    Absent written consent from the Producing Party, any individual who reviews non-public technical information relating to one or more of the products accused of infringement in this litigation that has been produced in this case and designated as HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL – SOURCE CODE by a Designating Party shall not participate, directly or indirectly, in the prosecution of any patent or patent application anywhere in the world (including, without limitation, originally filed applications, provisionals, non-provisionals, continuations, divisions, continuations-in-part, reexaminations, inter partes reviews, post-grant reviews, or reissues), involving the technology at issue in this litigation. Notwithstanding the forgoing, these provisions are not intended and shall not preclude any Outside Counsel or Experts (subject to the provisions of Section 7.4(b)) from participating in any reexamination proceedings, inter partes reviews, or the like involving the patent-in-suit except that neither Outside Counsel nor Experts shall draft or assist in the drafting

of any claim or amendment to any claim of the patents-in-suit. This prohibition shall begin when access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information is first received by the affected individual. This prohibition shall extend from the time of receipt of such information through and including two (2) years following the entry of a final non-appealable judgment or order or the complete settlement of all claims against the Party or Parties whose information was received or reviewed.

14.   **MISCELLANEOUS**

14.1   <u>Protective Order Not Applicable</u>:  None of the provisions of this Protective Order shall apply to the following categories of information that:

(a)   is now or subsequently becomes generally available to the public through no fault or breach on the part of the Receiving Party, its counsel, representatives, or Experts;

(b)   the Receiving Party can demonstrate to have had rightfully in its possession prior to its production herein or can demonstrate to have been independently developed by the Receiving Party - without use or benefit of the information;

(c)   the Receiving Party rightfully obtains after the time of disclosure hereunder from a non-party having the right to disclose the same to the Receiving Party without limitation; or

(d)   the Producing Party produced, disclosed, or provided to the Receiving Party without an obligation of confidentiality and not by inadvertence or mistake.

14.2   <u>Right to Further Relief</u>: Nothing in this Order abridges the right of any person to seek further or additional protection of any Disclosure or Discovery Material or to seek modification of the Order by the Court in the future.

14.3   <u>Right to Assert Other Objections</u>: By stipulating to the entry of this Protective

Order, no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Order.

14.4    No Restriction on Advising Client: Nothing in this Order shall be construed to prevent Counsel from advising their respective clients regarding these cases, even if Counsel must rely on Protected Information in formulating such advice, as long as no Protected Information is disclosed in violation of this Order.

14.5    Limitation on Discovery from Experts: Absent good cause, drafts of expert reports are not discoverable. Additionally, communications between an Expert (as defined in Section 2.5) and a Party's Counsel are not discoverable except as provided in Rule 26(b)(4)(C) of the Federal Rules of Civil Procedure. Reports and materials exempt from discovery under this section shall be treated as attorney work product for the purposes of this case and Protective Order.

14.6    Production by Non-Parties: Non-parties from whom documents are requested in this litigation, whether voluntarily or by subpoena, may (i) designate any documents or information they produce, as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" to the same extent and in the same manner as the parties to this litigation matter, and such documents or information shall be treated by the parties to this litigation matter in the same manner as documents or information so designated by a party; and (ii) intervene in this litigation matter to enforce the provisions of this Order as if they were a party.

15.    **INADVERTENT PRODUCTION OF PRIVILEGED DOCUMENTS**

15.1    If any Party, through inadvertence, produces any Disclosure or Discovery

Material information that it believes is immune from discovery pursuant to the attorney-client privilege, work product immunity, or any other applicable privilege or immunity, the Producing Party may give written notice to the Receiving Party that such Disclosure and Discovery Material is deemed privileged and that return of such Disclosure and Discovery Material is requested. Upon receipt of such written notice, the Receiving Party shall immediately gather the original and all copies of such Disclosure and Discovery Material of which the Receiving Party is aware and shall immediately return the original and all such copies to the Producing Party. The return of such Disclosure and Discovery Material to the Producing Party shall not preclude the Receiving Party from later moving the Court to compel production of the returned Disclosure and Discovery Material on the basis that any privilege applicable thereto has been waived. However, the inadvertent production of privileged or otherwise protected Disclosure or Discovery Material in this case shall not be deemed – and the Parties expressly waive their rights to argue otherwise – to constitute a waiver of any privilege or protection that otherwise would adhere to the Disclosure or Discovery Material information.

SO ORDERED THIS day of _____, 2015.


_____
The Honorable Leonard P. Stark

## **EXHIBIT A**

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND BY
<u>STIPULATED PROTECTIVE ORDER</u>

I, _____ [*print or type full name*], of _____

_____ [*print or type full address*], declare under penalty of perjury

that I have read in its entirety and understand the Stipulated Protective Order that was issued by

the United States District Court for the District of Delaware on _____ [**date**]   in   the

cases of *PLL Technologies, Inc. v. Altera Corporation*, C.A. No. 14-942-LPS-CJB, *PLL*

*Technologies, Inc. v. Microsemi SoC Corporation*, C.A. No. 14-943-LPS-CJB, and *PLL*

*Technologies, Inc. v. Xilinx, Inc.*, C.A. No. 14-945-LPS-CJB. I agree to comply with and to be

bound by all the terms of this Stipulated Protective Order, and I understand and acknowledge that

failure to so comply could expose me to sanctions and punishment in the nature of contempt. I

solemnly promise that I will not disclose in any manner any information or item that is subject to

this Stipulated Protective Order to any person or entity except in strict compliance with the

provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the

District of Delaware the purpose of enforcing the terms of this Stipulated Protective Order, even

if such enforcement proceedings occur after termination of this Action.

I hereby appoint _____ [*print or type full name*] of _____

_____ [*print   or   type*

*full address and telephone number*] as my Delaware agent for service of process in connection

with this Action or any proceedings related to enforcement of this Stipulated Protective Order.

Date: _____

City and State where sworn and signed: _____

Printed name: _____

Signature: _____

# EXHIBIT B

1

1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

4    INTELLECTUAL VENTURES I LLC, and
     INTELLECTUAL VENTURES II LLC,        :    CIVIL ACTION
5                                         :
             Plaintiffs,                  :
6                                         :
             v.                           :
7                                         :
     ALTERA CORPORATION, MICROSEMI        :
8    CORPORATION, LATTICE SEMICONDUCTOR   :
     CORPORATION and XILINX, INC.,        :
9                                         :    NO. 10-1065 (LPS)
             Defendants.
10                             - - -

11                        Wilmington, Delaware
                          Tuesday, July 10, 2012
12                        *Telephone Conference*

13                             - - -

14   BEFORE:        HONORABLE **LEONARD P. STARK**, U.S.D.C.J.

15                             - - -
     APPEARANCES:
16

17             FARNAN, LLP
               BY:  MICHAEL J. FARNAN, ESQ.
18
                    and
19
               DESMARAIS, LLP
20             BY:  MICHAEL P. STADNICK, ESQ., and
                    AMEET A. MODI, ESQ.
21                  (New York, New York)

22                      Counsel for Plaintiff

23

24
                              Brian P. Gaffigan
25                            Registered Merit Reporter

2

```
 1  APPEARANCES:  (Continued)

 2
             RICHARDS LAYTON & FINGER, P.A.
 3           BY:  ANNE SHEA GAZA, ESQ.

 4               and

 5           O'MELVENY & MYERS, LLP
             BY:  BRIAN BERLINER, esq.
 6               (Los Angeles, California)

 7                   Counsel for Microsemi Corporation

 8           ASHBY & GEDDES, P.A.
 9           BY:  TIFFANY GEYER LYDON, ESQ.

10               and

11           COVINGTON & BURLING
             BY:  MICHAEL N. KENNEDY, ESQ.
12               (Washington, District of Columbia)

13                   Counsel for Lattice Semiconductor Corp.

14           MORRIS NICHOLS ARSHT & TUNNELL, LLP
15           BY:  KAREN JACOBS LOUDEN, ESQ.

16               and

17           WOMBLE CARLYLE SANDRIDGE & RICE, LLP
             BY:  BEHROOZ SHARIATI, ESQ.
18               (Palo Alto, California)

19                   Counsel for Xilinx Inc.

20           MORRIS NICHOLS ARSHT & TUNNELL, LLP
21           BY:  JACK B. BLUMENFELD, ESQ.

22               and

23           WILMER CUTLER PICKERING HALE
             BY:  MARK D. SELWYN, ESQ., and
24               EVELYN C. MAK, ESQ.
                 (Palo Alto, California)
25
                     Counsel for Altera Corporation
```

3

```
 1                      - oOo -

 2              P R O C E E D I N G S

 3           (REPORTER'S NOTE:  The following telephone
        conference was held in chambers, beginning at 2:27 p.m.)
10:44:04 4   THE COURT:  Good afternoon, counsel.  This is
02:26:21 5   Judge Stark.  Who is there, please?
02:27:49 6   MR. FARNAN:  Good afternoon, Your Honor.
02:27:52 7   Michael Farnan on behalf of Intellectual Ventures.  With us
02:27:55 8   on the call is Michael Stadnick and Ameet Modi of Desmarais,
02:27:59 9   LLP.
02:26:01 10
02:26:01 11  THE COURT:  Okay.
02:26:02 12  MR. STADNICK:  Good afternoon, Your Honor.
02:26:02 13  MR. BLUMENFELD:  Good afternoon, Your Honor.
02:26:10 14  It's Jack Blumenfeld for Altera; along with Mark Selwyn and
02:26:15 15  Toby Mak from WilmerHale.
02:26:04 16  THE COURT:  Okay.
02:26:16 17  MR. SELWYN:  Good morning.
02:26:10 18  MS. JACOBS LOUDEN:  And for Xilinx, this is
02:26:16 19  Karen Jacobs Louden for Morris Nichols.  I have on the
02:26:19 20  line with me, Behrooz Shariati from Womble Carlyle.
02:26:19 21  THE COURT:  Okay.
02:26:22 22  MS. GAZA:  Good afternoon, Your Honor.  It's
02:26:23 23  Anne Gaza from Richards Layton for Microsemi; and I am
02:26:25 24  joined by Brian Berliner of O'Melveny & Myers.
02:26:28 25  THE COURT:  Okay.
```

4

```
02:28:28 1   MS. LYDON:  Good afternoon, Your Honor.  Tiffany
02:28:31 2   Lydon from Ashby & Geddes on behalf of defendant Lattice
02:28:33 3   Semiconductor.  With me is Michael Kennedy from Covington &
02:28:37 4   Burling.
02:28:38 5   THE COURT:  Okay.  That is everybody; correct?
02:28:42 6   All right.  Thank you.  I have a court reporter
02:28:45 7   with me.  For the record, it is our case of Intellectual
02:28:48 8   Ventures I and II, LLC v Altera Corp., 10-1065-LPS.  We are
02:28:58 9   here to discuss three disputes regarding the proposed
02:29:02 10  protective order.  The defendants raised the dispute
02:29:05 11  initially, so we will hear from them first.
02:29:12 12  MR. SHARIATI:  Good afternoon.  This is Behrooz
02:29:14 13  Shariati.  With the Court's permission, I have been
02:29:16 14  deputized by the other defendants to present the argument.
02:29:20 15  THE COURT:  That's fine.  Thank you.
02:29:20 16  MR. SHARIATI:  Your Honor, just cutting to the
02:29:24 17  heart of the matter, the first dispute is over the special
02:29:27 18  procedures that we have proposed for and the limitations we
02:29:33 19  proposed on the inspection and copying of the material that
02:29:37 20  is essentially the equivalent of source code for the kind of
02:29:40 21  products at issue in this case.
02:29:44 22  What we have offered the defendants is to make
02:29:49 23  available a computer with the appropriate software and the
02:29:52 24  hardware in a secure facility, for them to come with their
02:29:57 25  expert and inspect, select a portion of the material they
```

5

```
02:30:00 1   need and to have that produced in the -- you know, have
02:30:05 2   that copied and production numbered and given to them in
02:30:08 3   the normal course.
02:30:12 4   The plaintiffs' chief complaint basically is, they
02:30:16 5   haven't really engaged with us on any specific provision of
02:30:23 6   this.  They basically said to us that this is unusual, this is
02:30:26 7   unnecessary, this is not done in cases such as this.  And they
02:30:31 8   are wrong about all of that.
02:30:33 9   First of all, the Federal Rules of Civil
02:30:37 10  Procedure contemplates and provides for producing documents
02:30:39 11  through inspection, so that is nothing new about that.
02:30:42 12  With respect to the cases, the protective orders
02:30:49 13  they have cited in their papers, basically every single one
02:30:52 14  of them is wrong.  For example, they have cited the *Lonestar*
02:31:03 15  protective order in their order, the *Lonestar* v *Xilinx* case.
02:31:07 16  And in support of their opposition, they cite to, this is
02:31:12 17  Exhibit A to plaintiffs' papers, they cite to, on page 9,
02:31:17 18  they site to Section 5.1 of the protective order that says
02:31:21 19  the electronic documents shall be produced on CD ROMs, et
02:31:26 20  cetera.
02:31:28 21  Well, if you keep reading on the same page,
02:31:32 22  Your Honor, the exactly following section, Section (b), 5.3.
02:31:33 23  I'm sorry.  5.3(a) was the one I cited.  Section 5.3(b)
02:31:36 24  says:  The producing party, at its own option, can produce
02:31:43 25  documents using the procedure remarkably similar to what we
```

6

1  have proposed here.
2          On that score, they are wrong.  In fact, Section
3  5.1 of that protective order defines, very broadly defines
4  the kind of materials that are subject to this procedure,
5  which include source code as well as HDL, DDF, you know, all
6  the kind of stuff that we have to produce in this case.
7          Moving on to the past protective order they
8  cited, again they cited to a supplemental order that adds an
9  additional layer of security to documents that are copied
10  and provided to the other party.  What they fail to do is
11  to cite to the original protective order which is easily
12  obtainable.  And in that protective order, Section 5.1(a)
13  talks about inspecting the material for production and,
14  again, not the same exact procedures we have outlined here,
15  but, again, it contemplates the fact that the documents
16  will not be just copied and sent to them but they have to
17  come and look through them and pick ones they want.
18          THE COURT:  All right.  Let me shift you to the
19  orders that you have cited.  The plaintiffs say that each of
20  them are more restrictive at least in terms of access than
21  what you propose here.  Address that.
22          MR. SHARIATI:  The restrictions come generally
23  in the form of the printing.  Most of the protective orders
24  of this kind, including the default rules for software, for
25  example, in the District of Delaware, do not provide for

7

1  onsite printing.  The inspection party has to designate what
2  they want, what they want to see, and that goes through a
3  process of being printed by the producing party and
4  production numbered and then delivered.
5          What we have proposed here, which is less
6  restrictive, is to have a printer actually attached to the
7  machine used for the inspection and having them make their
8  own prints.  We still have to attach production numbers but
9  this is a lot less restrictive than what we had.  The other
10  aspect of it in terms of notice and where the documents are
11  going to be produced, we're willing to work with them on
12  that.  But in that respect, what we have produced is
13  actually less restrictive, Your Honor.
14          THE COURT:  And the 20 pages consecutive and
15  500 pages total, is that per defendant?
16          MR. SHARIATI:  Yes, Your Honor.  That is per
17  defendant.  And, by the way, that is the proposal that we
18  made.  Obviously, if they need more, we would be willing to
19  negotiate and meet and confer on that.  They didn't really
20  engage with us on those particularly pinpoint issues.  They
21  basically said that they can't have this procedure at all.
22          THE COURT:  All right.  I think you actually
23  represent Xilinx but I know you are speaking on behalf of
24  all defendants.  Address the argument that some of these
25  materials at least on behalf of your client were produced

8

1  without these protections in other cases.
2          MR. SHARIATI:  Your Honor, they were not.  That
3  is simply incorrect.
4          THE COURT:  Can you represent that on behalf of
5  all the defendants?
6          MR. SHARIATI:  To the extent that I know, Your
7  Honor, and I can represent that for Xilinx.  And I actually
8  have -- and maybe counsel for the individual defendants can
9  speak up if I'm wrong, but, for example, the *Altera v LSI*
10  case, I've been informed that the materials that are at
11  issue in that case that were similar to this, they were
12  produced under the exact same regime as the source code was.
13          And then the other ones I believe also -- and,
14  again, this is, I think that counsel for the other parties
15  should speak up, but I understand that there was another
16  protective order that was cited and they also did not produce,
17  simply just turn over their material to the other party in
18  that case but basically was under a similar set of controls.
19          THE COURT:  Okay.
20          MR. KENNEDY:  Your Honor, this is Mike Kennedy
21  for defendant Lattice, just to follow-up.  I can represent
22  for Lattice.
23          As far as Lattice can tell, it has never produced
24  this sort of material except under a similar regime as what
25  defendants propose here.

9

1          THE COURT:  All right.  Thank you.
2          Altera, are you able to make the same
3  representation?
4          MR. SELWYN:  With respect to the *Altera v LSI*
5  case, I can represent Altera made available its schematic
6  and hardware code in a same manner that we're proposing
7  here.  The case actually resolved itself before the other
8  side did such an inspection but there was no dispute in the
9  case that that is the way such an inspection would occur.
10          THE COURT:  Okay.  How about Microsemi?
11          MR. BERLINER:  Your Honor, this is my Brian
12  Berliner for Microsemi.
13          The letter from Mr. Farnan didn't identify any
14  instances in which they were aware of Microsemi producing
15  materials under less restrictive provisions; and I'm not
16  aware, having spoken with the client, of any such situations
17  or its predecessor in interest, which was Actel.
18          THE COURT:  Okay.  Thank you.
19          Mr. Shariati, let me have you move on to the
20  other two issues in dispute, please.
21          MR. SHARIATI:  Yes, Your Honor.  The next
22  question is the question of the acquisition bar.  I think
23  this is fairly straightforward.
24          The plaintiffs have agreed to a prosecution bar in
25  this case.  So this is essentially acknowledging that there is

10

1  a risk in the persons who see confidential information from
2  these defendants being engaged in prosecuting patents that
3  they could, through even with the best of intentions, they
4  could cause claims to be written to cover products based on
5  the information that they received in the case.
6        This is a sensible precaution.  It's routine in
7  patent cases.  The thing that complicates this a little bit
8  is that both, the IV entities and the Round Rock entity
9  that is Mr. Desmarais's other venture, both of these are
10 non-practicing entities whose vast majority of their patents
11 are not prosecuted from scratch but are simply acquired and
12 then asserted against working entities such as my client or
13 the other defendants in this case for licensing purposes.
14       So in this situation, because of the nature of the
15 enterprise and as set out in our papers, the prosecution bar
16 would not be sufficient to protect the potential leakage, the
17 inadvertent leakage of highly confidential information to the
18 patenting side of the house, to the patent acquisition side
19 of the house.  So we feel, since the patent prosecution bar
20 is appropriate, then the patent acquisition bar, because of
21 the nature of the business involved here, would also be
22 appropriate.
23       THE COURT:  Does your proposal seek to bar, say,
24 Mr. Desmarais, for example, from acquiring any patent and
25 from advising any client or anyone on any patent acquisition?

11

1        MR. SHARIATI:  No.  First of all, this is not
2  directed at Mr. Desmarais necessarily.  This is anyone who
3  is exposed to a highly confidential information would be
4  subject to the bar, the prosecution bar -- I'm sorry --
5  acquisition bar similar in scope to the prosecution bar in
6  the case.  You know, it is not going to stop the man from
7  working or acquiring patents.  It is within the same scope
8  as the prosecution bar they have already agreed to.
9        THE COURT:  All right.  Thank you.  Do you want
10 to address briefly the competitive decision maker bar?
11       MR. SHARIATI:  Yes, Your Honor.  That is even
12 more straightforward.  We feel that under cases such as *U.S.
13 Steel* that we have cited, the defendants are entitled to
14 prevent anyone who is a competitive decision maker from
15 viewing confidential information from the defendants for the
16 reasons that are stated in that case and other cases such as
17 that so that there is no accidental or inadvertent leakage
18 of information within that person's mind when they're making
19 competitive decisions.
20       This is not a John Desmarais provision.  This
21 is anyone who is a competitive decision maker who could
22 potentially make decisions that would put the defendants in
23 this case in an adverse or in a disadvantageous position
24 solely because of their knowledge of the highly confidential
25 documents should be barred from engaging in that activity.

12

1        So they can have a choice.  They can either
2  be on this case and see the highly confidential product
3  roadmaps, the financial information and all that stuff, or
4  they could be an entrepreneur and run a business.  We just
5  feel that under *U.S. Steel*, the two shall not meet in the
6  same person.
7        THE COURT:  And why is the bar on use of the
8  information for any purpose other than this litigation not
9  adequate protection?
10       MR. SHARIATI:  Because, Your Honor, the bar
11 frankly comes into play after they know the information.
12 And outside science fiction, it is really not possible to
13 erase that information from a person's mind once they have
14 been exposed to it.  So as honorable and as trustworthy as
15 Mr. Desmarais or anyone else on that firm is, and we cast
16 no aspersions on anybody, it is not possible for them to
17 isolate the information they learn in this case after the
18 fact while they are going and making business decisions.  So
19 we think it is more from a point of view of security.  And
20 from a point of view of avoiding disputes later, it makes
21 sense just so they're not exposed to it in the first place.
22       THE COURT:  And what about the representation
23 in the letter that at least Mr. Desmarais said he will not
24 participate in any future Round Rock activities adverse to
25 any of the defendants?  Does that not provide you the

13

1  protections you are seeking?
2        MR. SHARIATI:  Not completely, Your Honor.  For
3  one thing, as long as he -- one perfect example, one easy
4  example I can give you is if the Round Rock entity is
5  adverse to a customer of one of these defendants, not to
6  the entity as a whole, not to the current entity, and that
7  will necessarily involve the defendants here even though the
8  adversity may be with some other entity.  So we think that is
9  not adequate protection.  The best way to avoid the problem is
10 to just not have the exposure to the confidential information
11 in the first place.
12       THE COURT:  Okay.  Thank you.  Let me hear now
13 from IV, please.
14       MR. STADNICK:  Yes, Your Honor.  It's Michael
15 Stadnick for the IV plaintiffs.  Good afternoon.
16       THE COURT:  Good afternoon.
17       MR. STADNICK:  I'll start with the source code
18 category.
19       The problem we have the proposed source code
20 category is that it seeks to create what are really
21 unmanageable obstacles to our intent to take discovery of
22 core technical documents in the case, and they're really not
23 justified by any actual confidentiality or security concern.
24       So I'd like to start by stepping back a bit
25 and drilling down on exactly what restriction that they're

14

1   attempting to place on production and review of these
2   documents.  They created a category of what they call for
3   the purposes of the protective order source code documents,
4   and counsel described then as being the analog to source
5   code for purposes of the products in this case.  But that
6   is not really accurate.
7           The documents we're looking to obtain here
8   through discovery really aren't source code, and they don't
9   present the same sort of security and confidentiality issues
10  that you get with source code.  I'm happy to get into that,
11  and I'll return to that in a bit, but I think it's important
12  to look at what these documents actually are.
13          What they are are the electronic documents which
14  represent the blueprints for the accused products in this case.
15  They describe the architecture of the product, the circuitry
16  of the products, and the functionality of the products.  They
17  are at bottom the core technical documents that the defendants
18  are supposed to, under Your Honor's scheduling order, produce
19  to us by July 25th in this case.  That is only two weeks away.
20  We haven't received any technical documents yet at all or any
21  other documents for that matter in the case.
22          So to characterize these as source code
23  documents is really, from our vantage point, just an effort
24  to kind of analogize them to the type of protections that we
25  often see in cases for source code and don't dispute can be

15

1   appropriate in a source code context.
2           So what are those protections and what hurdles
3   are they trying to put up to our review of the documents in
4   this case?
5           Well, first, as counsel mentioned, they're
6   seeking to make us travel to outside counsel's office each
7   and every time we want to review a core technical document
8   in this case.  So if we want to review Xilinx's core
9   technical documents, we have to get on a plane and fly to
10  California and sit in a room in Xilinx's counsel's office
11  and review the documents there.  Likewise, with Altera,
12  we have to go to a separate counsel's office and review
13  documents.  With Lattice, we have to go to their counsel's
14  office, and so on.  And that is just unpractical and
15  unnecessary.
16          In addition to that, as Your Honor mentioned,
17  they're seeking to put some very severe restrictions on our
18  ability to print out and later review the documents that
19  are on the secure computer.  At any given time, we can
20  only print out 20 consecutive pages.  So if we have a core
21  technical document like a product specification that runs
22  over 20 pages, we're out of luck unless, of course, we
23  move the Court and bear the burden of demonstrating that
24  we're entitled to have every page of a document that is
25  more than 20 pages rather than some excerpt.

16

1           Likewise, as Your Honor mentioned, they're
2   seeking to impose a 500 page limit on the production of core
3   technical documents by any one defendant in this case.  I
4   can't ever being in a patent infringement case, and I
5   suspect most of the folks on the line would agree, where a
6   defendant produced only 500 pages of technical documents for
7   the accused products.  So that doesn't seem reasonable.
8           And then on top of all that, their proposed
9   provision effectively imposes a veto power on them to take a
10  look at whatever it is we decide to print, decide whether
11  they think it is being printed for an appropriate purpose
12  or not.  And if they, for whatever reason, decide it's not,
13  again the burden shifts on us to bring a motion and demonstrate
14  that we are printing the information for an appropriate purpose.
15  And that will just invite further motion practice and create
16  a lot of unmanageability in the discovery process going
17  forward.
18          So I guess the question becomes what grounds do
19  the defendants have for seeking these severe limitations?
20  And the answer is none, really.
21          We saw in the briefing and heard a little bit
22  today that these are their clients' crown jewels and the
23  most important documents in the company and that undisclosed
24  catastrophic events could happen if they're inadvertently
25  disclosed somehow.  But as defendants made clear to us, and

17

1   I know we have heard a little something different here
2   today, it's our understanding that defendants have in fact
3   made these exact same documents available for production in
4   prior litigations without these kinds of productions.
5           We've been meeting and conferring on this
6   issue for over a month now.  We have consistently asked them
7   to confirm for us whether or not they have produced the
8   documents without these protections.  They refuse to deny
9   the fact that they produced them in other litigations.  We
10  pulled protective orders from other litigations that don't
11  appear to impose these restrictions.
12          I understand that counsel today has taken issue
13  with our understanding of those protective orders.  That is
14  the first we've heard of any of it.  So to the extent that
15  they haven't produced documents without the same protections,
16  this is the first time we've heard it.
17          I listened pretty carefully for counsel for Altera
18  and counsel for Microsemi.  Counsel for Altera indicated in
19  the *LSI* case, he understood that these protections were in
20  place but he didn't make a broad representation as to other
21  cases.  And counsel for Microsemi likewise said he wasn't
22  aware of any other cases where they produced it, but it's
23  unclear to me even today they're making the representation
24  you asked them to make in the meet and confer process.
25          As Your Honor pointed out in the context I

18

1 believe of the prosecution bar, the general provision in the
2 protective order preventing us as outside counsel from using
3 materials produced in discovery for any purpose other than
4 this litigation should provide an ability for them to be
5 confident that we don't have any intention of abusing this
6 information.
7         I will return to, because I think it's important,
8 the technical documents that are at issue in this case and
9 source code. Source code is a person's readable instructions
10 for software. And software obviously presents a lot of
11 problems because source code gets disclosed inadvertently.
12 It's easy to copy, it's easy to disseminate, and it's easy
13 for anybody to take portions of it and use it for ... (Audio
14 lost.)
15         THE COURT: I'm sorry. We lost you for a
16 second. Repeat that last sentence. It's easy for what?
17         MR. STADNICK: It's easy for pretty much anybody
18 who gets their hands on source code to takes portions of it
19 or all of it and compile it and work it into their own
20 program and distribute it, to sell it, and it's very
21 difficult to detect. That is just the nature of software.
22         In this case, we're talking about a FPGA chip.
23 To make a FPGA chip, you need a fabrication facility which
24 costs a billion dollars. This isn't the same sort of
25 situation where even inadvertent disclosure of this

19

1 information creates a risk that somebody is going to copy
2 their chip and start competing with them in the marketplace
3 by selling FPGA chips. So it's fundamentally different in
4 that regard doesn't present the same sort of concerns. And
5 I think that is why customarily we haven't seen this kind
6 of information, whether in an FPGA case or DRAM case or
7 any other semiconductor case, be afforded this level of
8 protection.
9         Not to belabor the point but to briefly touch
10 on the support that the defendants cite for their proposed
11 restrictions on production of core technical documents.
12 The one case that any of the parties have identified from
13 Delaware that addresses this issue is the *ProMOS v Freescale*
14 case that was decided by Judge Farnan a few years back.
15 It's pretty much squarely on point.
16         The defendant Freescale sought confidentiality
17 protections that require inspection of RTL and HDL and
18 specification documents on a secure computer subject to very
19 stringent printing restrictions, and the defendant in that
20 case made all the same arguments we hear here today about the
21 crown jewels and about the hardware code being analogous to
22 source code. Judge Farnan ordered that these documents be
23 produced on a CD or DVD just like any other document. And
24 there is no indication that there were any dire consequences
25 in that case, anything got inadvertently disclosed, that any

20

1 prejudice was suffered by the defendant at all. And there is
2 no reason to believe that that would be suffered here.
3         We identified the *ProMOS v Freescale* case to the
4 defendants during the meet and confer process. They didn't
5 address it in their briefing. They didn't address it in
6 their comments here today. Instead, they focus on either
7 stipulated protective orders from other districts or the
8 optional provisions of the Northern District of California,
9 model protective order. Obviously, parties can address to
10 whatever restrictions for whatever reason they decide to
11 agree to. It doesn't provide support for imposing those
12 restrictions involuntarily on us here today.
13         So, at bottom, the only thing that entering the
14 so-called source code provisions of the protective order is
15 going to accomplish is to make it extremely difficult, if
16 not impossible, for us to conduct meaningful discovery of
17 the defendants' core technical documents, certainly within
18 the time frame the Court set out the scheduling order; and,
19 for that reason, we believe that the source code provision
20 should be rejected.
21         THE COURT: Did you want to say anything about
22 the acquisition bar?
23         MR. STADNICK: About the acquisition bar, we
24 really only have two relatively minor issues with it:
25         One, again, is it's unnecessary in light of the

21

1 provision that prevents us from using confidential
2 information for purposes other than this case.
3         The second issue is a slightly more practical
4 one. That is, we're seeing these sorts of arguments more
5 and more frequently in litigation these days, and when we
6 agree to a provision like an acquisition bar simply because
7 it doesn't matter to us, we don't plan to acquire patents
8 in this area, the next time an argument comes down the road,
9 just as we have seen in the letter briefing here, another
10 litigant will point to it as an indication that we made some
11 sort of concession or acknowledgment that there really was
12 an actual risk of inadvertent disclosure.
13         Now, that is a minor concern and that is not some-
14 thing we would stand on in fighting this provision. Frankly,
15 I think we would be willing to agree to the provision if
16 counsel for the defendants would agree that it resolves the
17 so-called competitive decision maker issue, which I will turn
18 to next. But as long as we're going to be, and I think we
19 will be if I am reading the tea leaves right, arguing that
20 issue more fulsomely, we might as well drill down and
21 determine whether there is a factual basis that justifies
22 entering into an acquisition bar in the case.
23         THE COURT: All right. Then why don't you very
24 briefly, because I'm running out of time, talk about the
25 competitive decision maker bar.

22

1   MR. STADNICK: Okay. The interesting thing
2 about the competitive decision maker bar is if you look at
3 it, it doesn't actually have any impact on discovery in
4 this case. It doesn't, on its face, prevent or allow the
5 defendants to withhold production of documents. It merely
6 allows them to designate with a special designation. And it
7 doesn't prevent us from reviewing it the way we normally
8 would review it because as we made clear, our view was that
9 nobody at my law firm is a competitive decision maker.
10   So why are they asking for this provision? And
11 there is really only one reason. That is because they foresee
12 filing in the motion a motion to specifically preclude me or
13 Mr. Desmarais or some other attorney at my firm from accessing
14 their confidential information, and they're trying to set up
15 an artificially low, legally erroneous standard to litigate
16 that motion.
17   The *U.S. Steel* case, the *Deutsche Bank* case, if
18 you look at the relevant authority in that case, it's clear
19 if they want to preclude outside counsel, litigation counsel,
20 from accessing their confidential information, they've got to
21 show a couple things:
22   First. They have to show on a case-by-case, fact
23 specific, person-by-person basis that there is an actual
24 unreasonable risk of inadvertent or improper disclosure if
25 that particular person receives confidential information.

23

1   Second. Assuming they can show that, there is a
2 balancing test that has to be performed where you weigh that
3 risk against the hardship to the counsel of the party whose
4 counsel is going to be impacted to determine whether a
5 protective order is appropriate.
6   What they're trying to do with this provision of
7 the protective order is to sidestep all of that and reduce
8 the analysis when, and if, they get around to filing the
9 motion that we expect them to file. We don't think the
10 motion has merit but it seems that they're going to file it.
11 When they file it, they're going to say all we have to do
12 is look at the protective order provision, prove in the
13 abstract that this person fits whatever this definition of
14 competitive decision maker is, and then they're per se
15 barred from receiving that confidential information. And
16 that is not the standard. That is not the standard that
17 should apply when they file their motion, if they file
18 their motion. And that is why we oppose entering it in a
19 protective order.
20   THE COURT: All right. Thank you.
21 Mr. Shariati, any brief response?
22   MR. SHARIATI: Very, very briefly, Your Honor.
23   We couldn't possibly disagree more with
24 Mr. Stadnick on the level of confidentiality of this material.
25 But I think the confusion here is -- I think there is some

24

1 level of confusion here that the plaintiffs are conflating
2 the very specific documents we wish to protect under this
3 procedure, which is design documents and materials that
4 essentially describe the actual structure of the devices that
5 can in fact be used to reproduce these devices. You don't
6 actually need to build your own foundry, Your Honor. As you
7 know, there are third-party foundries that make this stuff for
8 you. Xilinx doesn't have its own foundry. Everything is made
9 by GFMC in Taiwan.
10   So Mr. Stadnick couldn't be any more wrong
11 about that aspect of it. And we have made this clear to the
12 plaintiffs that we're not trying to sweep in text documents,
13 things in our specification, anything other than what is in
14 the design database that has to be accessed via that special
15 mechanism for the engineers to build and design these
16 devices. Anything else that is in the regular databases for
17 whatever, we would process those and if they're responsive,
18 we would produce them in the normal course.
19   Regarding the competitive decision maker, in
20 fact, Your Honor, if you look at the provision, we didn't
21 try to change the law in any way there. We just said if
22 someone is a competitive decision maker as under *U.S. Steel*.
23 In fact, we cited to that very case in the language proposed.
24 So we're not trying to change the barrier or anything else.
25 We just want to make sure that we have the right to prevent

25

1 our material falling into wrong hands -- potentially the
2 wrong hands.
3   That's all I have to say on that, Your Honor.
4   THE COURT: And what about your anticipated
5 motion? Is it correct you anticipate filing a motion?
6   MR. SHARIATI: Your Honor ... (Audio lost.)
7   THE COURT: I'm sorry, you are breaking up. Can
8 you try that again?
9   MR. SHARIATI: Sure. As I'm sitting here right
10 now, I can tell you without breaching client/attorney privilege
11 that no such motion is contemplated at this time, but I can't
12 give a blanket assurance it will not be forthcoming.
13   But as Mr. Stadnick correctly points out, it
14 really all depends on the factual picture of what exactly
15 the individuals do vis-a-vis this case and vis-a-vis their
16 entrepreneurial venture. So this is not. We're not trying
17 to lower the bar or anything like that. We're trying to
18 reserve the right to object if the facts support that.
19   THE COURT: Okay. Fine. Thank you. Well, let
20 me give you my rulings on these disputed provisions. They're
21 all provisions proposed by the defendants and the plaintiffs
22 resist them. And let me go through them in order.
23   First is the proposed Section 2.7 relating to
24 whether we will have in this protective order a
25 confidential source code designation that would apply to

26

1  what everyone seems to agree is not literally source code.

2  I'm going to include in the protective order a

3  provision that looks a lot like what has been proposed by

4  the defendants. Some of the details are going to differ.

5  And I'm going to, and hereby do, direct the parties to meet

6  and confer in light of what I'm about to say and see if you

7  can agree on the details. And if you can't, then obviously

8  I will resolve that going forward.

9  But let me first say, in general, the Court

10  believes that good cause has been shown for the type of

11  protection of this type of material as sought by defendants.

12  In the Court's view, these hardware design materials and

13  schematics and similar documents are analogous to software

14  in a software case and, therefore, are worthy of some type

15  of source code like protection.

16  The analogy holds up in the Court's view in part

17  because it's represented at least that these materials can be

18  used, by those who are knowledgeable and have access to the

19  right materials, they can be used to replicate the defendants'

20  products. Improper disclosure of these materials therefore

21  would work the same type of harm to defendants as improper

22  disclosure of software. And all of this is reflected in how

23  these materials are, it is represented, maintained by the

24  defendants. For instance, in some sort of some complex

25  hierarchal electronic database.

27

1  While I understand the plaintiffs argues that

2  there are fewer people who can make use of this type of

3  material than evidently could use make of software, that

4  does not in the Court's view make the analogy inappropriate

5  and indeed I think reflects and does nothing to deny that

6  there is great value to these materials, and it is appropriate

7  for defendants to wish to be careful about how they are

8  distributed and to whom.

9  The issue then becomes what about the precise

10  protocols that the defendants are proposing to limit the

11  plaintiffs access to these materials? And I do think the

12  precise protocols listed are too onerous in light of the

13  fact that there are multiple parties here, in light of how

14  few pages the defendants have initially offered to allow to

15  be printed.

16  So what I want the parties to meet and confer

17  on and discuss is how much to expand the printing that is

18  authorized in the protective order. 20 consecutive pages

19  and a total of 500 pages per defendant strikes me as too

20  small in both regards, so the parties should see if they can

21  reach agreement on a larger number.

22  I want the parties to discuss whether it is

23  possible to identify one outside counsel's office that could

24  take possession of these materials for all four defendants

25  and thereby locate them in one office that plaintiff's

28

1  counsel would be able to go to and more efficiently review

2  these materials. And I would contemplate even ordering

3  that one office to be located in a city of the choice of

4  the plaintiffs, because I do want to make sure that these

5  provisions, while necessary to protect defendants' valuable

6  properly, do not make it unduly burdensome for plaintiffs to

7  investigate and prosecute its case.

8  So all that said, you all are to meet and confer

9  and submit to me a revised proposed protective order that

10  includes a provision like the defendants have proposed,

11  hopefully with agreed upon specifics in terms of the protocol

12  in light of what I have said. If there remain disputes about

13  the protocol, then put your competing proposals in what you

14  submit. And if I need anything further from you, I will let

15  you know.

16  I have also considered that plaintiff has

17  pointed me to a case from this district in which Judge

18  Farnan reviewed a similar request and evidently denied it.

19  On that, all I can say is that reasonable minds can disagree

20  on issues like this, and I'm persuaded to do as I have said

21  here I intend to do with respect to the protective order here.

22  Turning briefly to the other two disputed

23  provisions, the proposed bar on competitive decision making,

24  decision makers having access to the highly confidential

25  information and the proposed bar on participation in patent

29

1  acquisition. The protective order I sign should contain all

2  those provisions. I'm persuaded by defendants that they are

3  appropriate.

4  With respect to the competitive decision maker

5  proposal, I do want to emphasize I am not today making any

6  finding as to whether anybody affiliated with this case,

7  affiliated with the plaintiffs, affiliated with plaintiffs'

8  firms, whether he or she would be found to be a competitive

9  decision maker. It's not necessary to resolve that issue

10  today. And,

11  If that issue does arise, nothing I am ruling

12  today by adopting the defendants' proposal is intended to

13  alter or reduce in any way the showing that would be

14  necessary by defendants if they are to seek to prevent any

15  particular person in this case from having access to the

16  highly confidential information. And as I understand it,

17  the defendants do not believe that their proposal, which

18  is now being adopted in any way alters the showing that

19  they would have to make if that day comes.

20  With respect to the patent acquisition bar,

21  essentially the plaintiffs' argument is it's unnecessary in

22  light of the agreed upon bar on use of information for any

23  purpose other than the litigation.

24  On that point, I'm more in agreement with the

25  defendants that that simply is not adequate protection in

1   the context here given, as far as I understand, the
2   essential impossibility of human beings to completely
3   segregate their minds and not make any inadvertent use
4   whatsoever of any information once they are exposed to it.
5           I need to jump on to another call but, very
6   quickly, I'll ask if there are any questions on what I have
7   ruled.  First, Mr. Shariati.
8           MR. SHARIATI:  No, your Honor.  Is there any
9   particular time line you have in mind for us or can we just
10  meet and confer during the next few weeks?
11          THE COURT:  If I did not say, I meant to say a
12  week from today.  So I want your revised proposed protective
13  order a week from today.  Thank you.
14          MR. SHARIATI:  That was the only question I had.
15  Thank you.
16          THE COURT:  Mr. Stadnick?
17          MR. STADNICK:  No, your Honor.  No questions.
18          THE COURT:  All right.  Thank you, everyone.
19  Good-bye.
20          (Telephone conference ends at 3:10 p.m.)
21
22      I hereby certify the foregoing is a true and accurate
    transcript from my stenographic notes in the proceeding.
23

24              /s/ Brian P. Gaffigan
                Official Court Reporter
25                U.S. District Court

# EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF DELAWARE

 3   INTELLECTUAL VENTURES I LLC,, :
                                   :C.A. No. 12-193-LPS
 4          Plaintiff,             :
                                   :JURY TRIAL DEMANDED
 5      v.                         :
                                   :
 6   AT&T MOBILITY LLC, AT&T       :
     MOBILITY II LLC, NEW CINGULAR :
 7   WIRELESS SERVICES, INC., SBC  :
     INTERNET SERVICES, INC., AND  :
 8   WAYPORT, INC.,,               :
                                   :
 9          Defendants.            :
     _____:
10                                 :
     INTELLECTUAL VENTURES II LLC, :
11                                 :C.A. No. 13-1631-LPS
            Plaintiff,             :
12                                 :JURY TRIAL DEMANDED
        v.                         :
13                                 :
     AT&T MOBILITY LLC, AT&T       :
14   MOBILITY II LLC, NEW CINGULAR :
     WIRELESS SERVICES, INC., SBC  :
15   INTERNET SERVICES, INC., AND  :
     WAYPORT, INC.,                :
16                                 :
            Defendants.            :
17   _____:
                                   :
18   INTELLECTUAL VENTURES I, LLC, :
                                   :C.A. No. 13-1632-LPS
19          Plaintiff,             :
                                   :JURY TRIAL DEMANDED
20      v.                         :
                                   :
21   T-MOBILE USA, INC., AND       :
     T-MOBILE US, INC.,            :
22                                 :
            Defendants.            :
23

24
```

```
 1
 2      INTELLECTUAL VENTURES II,   :
        LLC,                        :
                                    :C.A. No. 13-1633-LPS
 3           Plaintiff,             :
                                    :JURY TRIAL DEMANDED
 4         v.                       :
                                    :
 5      T-MOBILE USA, INC., AND     :
        T-MOBILE US, INC.,          :
 6                                  :
             Defendants.            :
 7                                  :
        _____ :
 8                                  :
        INTELLECTUAL VENTURES I,    :
 9      LLC,                        :
                                    :C.A. No. 13-1634-LPS
10           Plaintiff,             :
                                    :JURY TRIAL DEMANDED
11         v.                       :
                                    :
12      NEXTEL OPERATIONS, INC.,    :
        and SPRINT SPECTRUM, L.P.,  :
13                                  :
             Defendants.            :
14      _____ :
                                    :
15      INTELLECTUAL VENTURES II,   :
        LLC,                        :
16                                  :C.A. No. 13-1635-LPS
             Plaintiff,             :
17                                  :JURY TRIAL DEMANDED
           v.                       :
18                                  :
        NEXTEL OPERATIONS, INC.,    :
19      and SPRINT SPECTRUM, L.P.,  :
                                    :
20           Defendants.            :
        _____ :
21

22

23

24
```

```
 1    INTELLECTUAL VENTURES I,      :
      LLC,
 2                                  : C.A. No. 13-1636-LPS
           Plaintiff,              :
 3                                  : JURY TRIAL DEMANDED
        v.                          :
 4                                  :
      UNITED STATES CELLULAR        :
 5    CORPORATION,                  :
                                    :
 6         Defendant.              :
      _____ :
 7                                  :
      INTELLECTUAL VENTURES II,     :
 8    LLC,                          : C.A. No. 13-1637-LPS
                                    :
 9         Plaintiff,              : JURY TRIAL DEMANDED
                                    :
10       v.                         :
                                    :
11    UNITED STATES CELLULAR        :
      CORPORATION,                  :
12                                  :
           Defendant.              :
13
14
                    Thursday, June 5th, 2014
15                  1:31 p.m.

16                  Teleconference
                    Chambers of Judge LEONARD P. STARK
17
                    844 King Street
18                  Wilmington, Delaware

19
      BEFORE:       THE HONORABLE LEONARD P. STARK,
20                  United States District Court Judge

21

22

23

24
```

```
 1      APPEARANCES:

 2

                FARNAN LLP
 3              BY:  BRIAN E. FARNAN, ESQ.

 4                        -and-

 5              DECHERT LLP
                BY:  STEPHEN AKERLEY, ESQ.
 6              BY:  JAMES RAGON, ESQ.

 7                  On behalf of Plaintiff

 8

                MORRIS, NICHOLS, ARSHT & TUNNELL
 9              LLP
                BY:  KAREN JACOBS, ESQ.
10              BY:  JENNIFER YING, ESQ.

11                        -and-

12              GIBSON DUNN
                BY:  ALLISON WATKINS, ESQ.
13
                    On behalf of T-Mobile
14

15                        -and-

16              MCGUIRE WOODS
                BY:  KRISTEN CALLEJA, ESQ.
17
                    On behalf of Sprint
18

19              RICHARDS, LAYTON & FINGER
                BY:  STEVEN FINEMAN, ESQ.
20

21                        -and-

22              SIDLEY AUSTIN, LLP
                BY:  JOHN WISSE, ESQ.
23
                    On behalf of U.S. Cellular
24
```

```
1                    SETIZ, ROSS, ARONSTAM & MORTIZ, LLP
2                    BY:  BENJAMIN SCHLADWEILER, ESQ.

3                              -and-

4                    BAKER BOTTS LLP
                     BY:  ROGER FULGHUM, ESQ.
5
                         On behalf of AT&T
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    THE COURT:  Good afternoon,
 2     everybody.  This is Judge Stark.  Who's there,
 3     please?
 4                    MR. FARNAN:  Good afternoon, Your
 5     Honor.  Brian Farnan on behalf of the
 6     plaintiffs, and with me is Steve Akerley and
 7     James Ragon from Dechert.
 8                    THE COURT:  Okay.
 9                    MS. JACOBS:  Good afternoon, Your
10     Honor.  For the defendants Sprint and T-Mobile,
11     this is Karen Jacobs and Jennifer Ying from
12     Morris Nichols.  We have on the line with us for
13     T-Mobile Allison Watkins from Gibson Dunn, and
14     for Sprint we have on the line with us Kristen
15     Calleja from McGuire Woods.
16                    THE COURT:  Okay.  Thank you.
17                    MR. FINEMAN:  Good afternoon, Your
18     Honor.  Steve Fineman at Richards, Layton, and
19     Finger on behalf of U.S. Cellular, and also on
20     the phone with me, I have John Wisse from
21     Sidley.
22                    MR. SCHLADWEILER:  Good afternoon,
23     Your Honor.  This is Ben Schladweiler from Seitz
24     Ross on behalf of AT&T, and with me is Roger
```

| | |
|---|---|
| 1 | Fulghum from Baker Botts. |
| 2 | THE COURT:  Okay. |
| 3 | MS. JACOBS:  And that's all the |
| 4 | defendants. |
| 5 | THE COURT:  Okay.  Thank you very |
| 6 | much.  So I have a court reporter here with me, |
| 7 | and we're here for a number of related |
| 8 | Intellectual Ventures cases.  *Intellectual* |
| 9 | *Ventures I, LLC, versus AT&T Mobility LLC et* |
| 10 | *al.*, Civil Action Number 12-193-LPS is one of |
| 11 | the them, and according to the letters, at |
| 12 | least, we're also here in 13-1631, -1632, -1633, |
| 13 | -1634, -1635, -1636, and -1637. |
| 14 | In any event, we're here to |
| 15 | discuss two disputes related to a possible |
| 16 | acquisition bar and a prosecution bar, both of |
| 17 | which are proposed by the defendants and opposed |
| 18 | by the plaintiffs, so let me hear first, please, |
| 19 | on both issues from the defendants. |
| 20 | MS. JACOBS:  Thank you, Your |
| 21 | Honor.  This is Karen Jacobs from Morris |
| 22 | Nichols, and I'll do the lead comments for |
| 23 | defendants, but other defendants may join in as |
| 24 | well. |

```
 1                    I'll start on the prosecution bar,

 2       and actually I don't believe that the -- that

 3       our prosecution bar is opposed.  Really what the

 4       dispute is, is a dispute about the scope of the

 5       prosecution bar.

 6                    I think the parties agree that

 7       there should be a prosecution bar, and we also

 8       agree that it will apply to post-grant

 9       proceedings.  What we are disputing is the scope

10       of what would apply there.

11                    And the problem that we have with

12       the exception that Intellectual Ventures seeks

13       to draw is that it's not entirely clear what

14       they're looking for, but basically what we

15       understand from their proposal is that they want

16       to still have litigation counsel be able to

17       discuss with IPR counsel the prior art and claim

18       construction, and in our view, that's the

19       exception that would swallow the rule, because

20       that's what the IPR is about, is about the scope

21       of the claims in the prior art, and that's the

22       very concern that we had in raising a

23       prosecution bar in the first place.

24                    In our view, having litigation
```

1       counsel confer with IPR counsel runs the risk

2       that litigation counsel, who has viewed

3       defendants' confidential information, that their

4       views about claim construction and prior art are

5       necessarily influenced by what they've seen from

6       the defendants' confidential information and

7       that the positions that they're going to take in

8       litigation in order to maintain an infringement

9       read.  So in our view, that's the exception that

10      would swallow the rule.

11                 And really all we've heard in

12      reply on the prosecution bar is that counsel are

13      bound by the protective order and won't misuse

14      information, and we certainly appreciate that,

15      but that's really the starting point, not the

16      end point.

17                 We're certainly starting with the

18      assumption -- and we would we assume -- that

19      counsel are ethical people.  We know that, and

20      we understand that they don't intend to misuse

21      confidential information, but the whole purpose

22      of having a prosecution bar is to add a layer of

23      protection against the inadvertent misuse, and

24      it's the notion that one simply can't segregate

1    information from one's mind, even with the best

2    of intentions.

3                 The other response we've heard

4    from IV is that counsel has agreed that they

5    themselves, the counsel who has reviewed

6    confidential information, won't participate in

7    claim amendments.

8                 We have two problems with that.

9    The first problem is that Intellectual Ventures

10   hasn't agreed that it won't engage in claim

11   amendments, and, again, we just have the problem

12   that there's no way to segregate that

13   information.  Whether or not litigation counsel

14   participates in claim amendments, their views on

15   the prior art in claim construction would

16   necessarily be useful to IPR counsel in deciding

17   which claims to amend or not amend.

18                 Even without claim amendments, the

19   issue is still -- there still is what arguments

20   to make to overcome the prior art, but

21   preserving enough claim scope to preserve an

22   infringement read.  Even without claim

23   amendments, that issue would be there, but

24   Intellectual Ventures has not agreed not to

 1      amend the claims in an IPR.

 2              The last point I'll make on the

 3      prosecution bar is that Intellectual Ventures

 4      has said that it needs to have litigation

 5      counsel be able to confer with IPR counsel so

 6      that they don't take inconsistent positions.  We

 7      disagree with that, because our claim

 8      construction positions are a matter of public

 9      record.  The invalidity contentions are a matter

10      of public record.  The claim construction briefs

11      will be filed next week.  IPR counsel can have

12      access to all that, so that very concern can be

13      addressed by just reviewing litigation

14      materials.

15              What we object to is the idea of

16      litigation counsel informing and conferring with

17      IPR counsel about the scope of the prior art and

18      arguments that should be made in a strategic

19      way.

20              THE COURT:  All right.  Let me ask

21      you a couple of questions before you move on to

22      the acquisition bar question.

23              First, I think it was your letter

24      that mentioned there may be a further dispute as

12

1     to whether the bar should apply to the field or

2     the subject matter.  Is that an issue that I

3     need to decide, Ms. Jacobs?

4             MS. JACOBS:  I believe so.  I

5     believe that is still a disputed issue, and our

6     concern is just simply that because of the

7     nature of the confidential information that's

8     going to be reviewed, it may -- that that

9     confidential information has a broader --

10    broader application than just the patent itself,

11    and the risk of misuse is broader than just the

12    particular field of the --

13            In other words, the risk of misuse

14    relates to the information that's reviewed and

15    not just the scope of the patents, and that's

16    why we continue to have a more minor dispute,

17    but still a dispute, that we believe that the

18    bar should extend to the field of technology.

19            THE COURT:  Okay.  And I have come

20    to learn, as you may know, that at least in one

21    case, Judge Robinson, I believe, has allowed a

22    party-and-plaintiff situation to appoint some

23    sort of intervening attorneys, for lack of a

24    better word.  Someone who could coordinate the

13

1    positions between IPR counsel and litigation

2    counsel, but that intervening attorney would

3    themselves be subject to some restrictions in

4    terms of access to highly confidential

5    information and that sort of thing.

6              I don't know if that's a concept

7    that you are familiar with or not, but if you

8    have any comments on whether that's something

9    that defendants would want to me consider as an

10   alternative here, I'd be happy to hear that.

11             MS. JACOBS:  I'm not familiar with

12   that, Your Honor, and I had not heard that.  I

13   don't know that that would solve the problem

14   here.

15             For one, I think just by the

16   nature of the procedural stance of where we are

17   in this case, I'm not sure than an intermediary

18   would even be needed, given that the claim

19   construction chart is filed, the claim

20   construction brief will be filed next, the

21   invalidity contentions are available, so I'm not

22   sure why an intermediary would be needed, and if

23   the intermediary were -- if we did have one and

24   that intermediary were to pass along the

```
 1    information from the litigation counsel, I'm not
 2    sure how that would solve the problem.  There
 3    would still be the risk of that information that
 4    was gleaned from defendants' confidential
 5    information could find its way in the IPR.
 6                 THE COURT:  Okay.  Thank you.  Go
 7    on and talk, if you would, about the acquisition
 8    bar you're proposing.
 9                 MS. JACOBS:  Thank you, Your
10    Honor.
11                 On the acquisition bar, I think,
12    again, we start from the same place, from the
13    same premise, that the parties agree that there
14    should be some acquisition bar and that it would
15    be appropriate in this case, and I think
16    particularly in the circumstances here, there's
17    no doubt that the concern is real that
18    information that's gleaned from defendants'
19    confidential information could inadvertently --
20    and again we're talking about inadvertent
21    misuse -- could inadvertently be used to acquire
22    patents.
23                 And the reason I say this is a
24    real issue is Intellectual Ventures has filed
```

1    not just this round of lawsuits, but another

2    round of lawsuits against these same defendants

3    with the same law firm.  Intellectual Ventures

4    is a patent acquisition entity, and has filed 31

5    lawsuits here, so I don't think there's really a

6    dispute that there's a concern here that needs

7    to be addressed.

8              The response we've heard from

9    Intellectual Ventures is basically what they

10   proposed in their letter, is an undertaking that

11   they will not use defendants' confidential

12   information in advising clients on patent

13   acquisition.  That, again, does not address the

14   question of inadvertent misuse.

15             We, again, assume everyone is

16   acting ethically, but there's a real concern

17   here, especially given the nature of these

18   cases, that this information could be used.

19             The only real response we've heard

20   is that our proposal is vague or overbroad.  I

21   guess we strongly disagree with that, and we've

22   been through very, very extensive

23   meet-and-confers on the acquisition bar, and

24   through those meet-and-confers, we believe we've

1    narrowed the acquisition bar to the point where

2    it really is very tailored to address the

3    concern.

4              First of all, it only applies to

5    individuals who have reviewed confidential

6    information.  It does not apply to the firm as a

7    whole.

8              This Court has entered acquisition

9    bars that aren't specific to a particular a kind

10   of entity.  In response to Intellectual

11   Venture's concerns or counsels' concerns, we

12   tried to narrow the scope of the bar so that it

13   would be clear that it only would apply only to

14   a particular kind of advice, mainly about advice

15   about acquiring patents, and only to a

16   particular kind of entity.

17              In other words, the information

18   couldn't be used -- or counsel couldn't be

19   involved in advising clients who have a

20   substantial part of their business in acquiring

21   or asserting patents or also who would assert or

22   create consideration of asserting patents

23   against the defendants here and limited to this

24   field of technology.

1          Now, we've tried to be as clear as

2     we can in articulating that.  We've tried to

3     tailor, as much as possible, the bar to the

4     risks.  We've asked Intellectual Ventures, if

5     they have concerns about our language, to please

6     propose language that would address their

7     concerns, and the response has been just to

8     say -- it's vague, and then to take the position

9     that the bar should only apply to that they

10    would endeavor not to use confidential

11    information.

12         So I think that's where the

13    impasse came to play, is we think we've tried to

14    narrow this as much as we can to address the

15    concerns, and we haven't had any response back.

16         The last thing I'll just mention

17    applies to, I think, both the prosecution and

18    the acquisition bar, is the assertion that

19    somehow it's unfair because it only applies one

20    way.

21         It's certainly not our intent to

22    be unfair.  We're trying to address a particular

23    risk and a particular need.  There's not a risk

24    or a need going in the other direction, because

```
 1        there are no patents to be asserted against

 2        Intellectual Ventures, and the defendants here

 3        aren't acquiring patents to assert against

 4        Intellectual Ventures.

 5                    So we certainly understand the

 6        concerns, and we've tried to be as a narrow as

 7        we can in addressing them, but it's not a

 8        question of being punitive.  It's a question of

 9        meeting the needs of protecting the defendants'

10        confidential information in the circumstances

11        here.

12                    Thank you, Your Honor.

13                    THE COURT:  A couple questions for

14        you on that.

15                    So there's a lot of different

16        defendants here with different defense counsel.

17        Isn't the concern that defendants are raising

18        vis-a-vis the plaintiff also a concern amongst

19        defendants?

20                    That is, for instance, if Sprint

21        may turn out to acquire a patent next week, they

22        might assert it against AT&T, and in that

23        circumstance, wouldn't AT&T have a concern that

24        Sprint's outside counsel may have advised Sprint
```

1    on the acquisition of that patent based, in

2    part, on confidential information they learned

3    in the course of this case?

4              MS. JACOBS:  Two responses to

5    that, Your Honor.

6              The first thing is, as a general

7    matter, the defendants are not sharing each

8    other's confidential information with each

9    other, so Sprint isn't producing its documents

10   to AT&T and vice versa, so the concern about

11   that happening is lesser.

12             Now, to the extent that Sprint's

13   outside counsel sees AT&T's outside counsel

14   information because it's in a pleading, what

15   might be in a pleading, of course, is going to

16   be fairly minor compared to the overall document

17   production, and there's really something unfair

18   about just because defendants have been sued

19   together that they should be penalized because

20   another defendant's confidential information

21   appears in a pleading.

22             And there's also just a difference

23   in the nature of -- well, of course, the entity

24   itself isn't controlling.  The fact of the

```
 1      matter is that there's a different business

 2      model.  As practicing entities, they're not in

 3      the business of asserting patents against each

 4      other as much as primary operating businesses,

 5      and that's not the primary issue.

 6                  The primary issue is that really

 7      each defendant doesn't have visibility into each

 8      other's confidential information.

 9                  THE COURT:  Are you saying outside

10      counsel for AT&T are not going to have access to

11      the highly confidential information of Sprint,

12      for example?

13                  MS. JACOBS:  Not as a matter of

14      course.  That's correct, Your Honor.

15      Productions are not being made to each other.

16      Whether or not some information might be gleaned

17      by, if -- for example, if Intellectual Ventures

18      files a brief that includes confidential

19      information of both defendants, we hope that

20      that would be kept to a minimum, and the nature

21      of having separate cases should be that the

22      defendants here don't want to be exposed to each

23      other's confidential information.

24                  THE COURT:  All right.  Well,
```

1   then, how -- what do defendants intend when they

2   say a substantial part of the client's business

3   relates to the acquisition and/or assertion of

4   patents?

5              And specifically, if AT&T, for

6   instance, did acquire another company in this

7   area and acquired its patent portfolio, wouldn't

8   AT&T, then, come within the scope of this

9   acquisition bar?

10             MS. JACOBS:  I don't think so,

11  Your Honor.  What we were trying to capture

12  there was the situation where an entity has a

13  business model whose business substantially is

14  buying and asserting patents, because of the

15  heightened risk that this kind of information

16  can be misused.

17             While AT&T or any other defendant

18  might buy or acquire patents, it's not a

19  substantial part of their business model.  It's

20  really the nature of the business model that

21  makes the concern greater.

22             THE COURT:  All right.  And then

23  the examples that the plaintiff lists on page

24  two of their letter, circumstances that they say

```
 1        they would be concerned, they as outside
 2        counsel, would be barred from undertaking if I
 3        do impose this acquisition bar.  Aren't they
 4        right to have that concern, those concerns, that
 5        your provision might bar them from doing things
 6        like participating in certain settlement
 7        discussions and the like?
 8                    MS. JACOBS:  I think the list is
 9        overstated.  For example, item number four on
10        the list is that they say they will be barred
11        from advising a client to sell a relevant
12        patent.  The bar only applies to acquisition of
13        patents, not selling of patents.
14                    I think also -- and I could give
15        examples of others of these as well.  I think
16        they're overstated.
17                    But beyond that, I think even in
18        the context of this parade of horribles, we need
19        to go back to it's really a very limited scope
20        of to whom this would apply.  We're not seeking
21        to stop Dechert from engaging in counseling of
22        clients by any means.
23                    What we were talking about is
24        particular individuals that use defendants'
```

```
 1        confidential information in this case shouldn't
 2        be able to provide counseling on acquisition of
 3        patents to entities in this field of technology,
 4        and only if a substantial part of their business
 5        is acquiring and asserting patents.
 6                     So I think when you put it to that
 7        narrow scope, it's really not interfering with
 8        anybody's practice of law.  It's really -- it's
 9        asking people to be cautious and
10        prophylactically preventing misuse of
11        confidential information for a very narrow set
12        of potential clients.
13                     THE COURT:  All right.  Thank you.
14        Briefly, did any other defendant want to say
15        anything?
16                     MR. SCHLADWEILER:  Nothing for
17        AT&T, Your Honor.
18                     THE COURT:  Okay.  I'm not hearing
19        anything from defendants, then.  Turn it over to
20        plaintiff, please.
21                     MR. AKERLEY:  Good afternoon, Your
22        Honor.  This is Steve Akerley for the
23        plaintiffs.  With your permission, I'm going to
24        start with the acquisition bar.
```

```
 1              THE COURT:  That's fine.

 2              MR. AKERLEY:  And I am going to

 3    ask, because of the importance of this

 4    particular issue as it relates beyond our

 5    clients, necessarily, to Dechert and to the

 6    Farnan law firm with respect to the ability to

 7    practice law freely in the future, I expect that

 8    Brian Farnan will have some things to add.

 9              THE COURT:  Okay.

10              MR. AKERLEY:  I want to start with

11    the last comments made by defense counsel, which

12    relate to the quote, unquote, parade of

13    horribles set forth in our letter.

14              The interesting thing I find about

15    that is what we did for Your Honor and counsels'

16    benefit was to describe the things, very

17    specifically, that members of this team would

18    not be able to do in the future if this

19    acquisition bar is imposed.

20              There are quite a number of us, as

21    you may imagine, as between this case and the

22    other IP case that defense counsel keeps

23    referring to, and many of us have somewhat

24    varied practices.  That is, we do engage in due
```

25

```
 1        diligence for clients, and the question really

 2        does become, what could we do ethically under

 3        this protective order?

 4                    And it's a broad prohibition that

 5        would affect people across practice groups and

 6        with client designations in the future that are

 7        too vague to be adequately accepted.  I don't

 8        know what "substantial part of the business"

 9        means.  I do know that acquiring patents

10        includes not only going out and buying

11        portfolios, but it involves patent prosecution,

12        and I know that AT&T has tens of thousands of

13        patents in its portfolio.  So is that

14        substantial?  I would say, Yeah, under

15        somebody's definition, but I don't know what it

16        means.

17                    So we do contend that the

18        provision is not only overly broad and not

19        intended to deal with a real threat, but also

20        hopelessly vague.

21                    I want to turn to -- I'm not going

22        to go through the papers.  I know Your Honor has

23        spent a lot of time on this and it has been

24        briefed a couple of times now, but I had two
```

```
 1        observations actually coming to work this
 2        morning, and one of them was exactly the
 3        observation that you had, Your Honor, that we
 4        did not deal with in the papers, and that is the
 5        threat of AT&T's counsel seeing Sprint and
 6        T-Mobile and U.S. Cellular's confidential
 7        information should be a far greater concern,
 8        given the competitive relationship between these
 9        entities.
10                   The notion that it's a more
11        limited subset of data and so the threat is
12        diminished, really is sort of a -- it seems to
13        be a made-up excuse to me, because the threat is
14        exactly the same.  There are not only going to
15        be briefings in this case -- those will be
16        summary judgment briefings that will include a
17        vast amount of all defendants' confidential
18        information -- there are going to be expert
19        reports that all of defendants' counsel will be
20        present at, presumably.  There's going to be a
21        trial in this case, in all likelihood, where an
22        enormous amount of technical and financial
23        information is going to be disclosed among
24        defendants' counsel.
```

1                  So the question I had in trying to

2        formulate this exactly the way Your Honor did

3        is, why are defendants comfortable with that?

4        And I will take defendants at their word that

5        they are not questioning my integrity or anybody

6        else's at either the Dechert firm or the Farnan

7        firm, but that doesn't explain why they might be

8        more comfortable with their codefendants seeing

9        the information with no similar provision

10       regarding disclosure and use in the future.

11                 And the reason for that is in

12       paragraph two of the protective order, which was

13       agreed to, there was a provision that has been

14       in every protective order that I have subscribed

15       to for 22 years.  I suspect that every counsel

16       on the call today would say the same thing.  And

17       that provision says, Thou shalt not use any

18       information received in this case for purposes

19       other than this litigation.  And I'm

20       paraphrasing, because everybody knows the

21       language.

22                 And what that prohibits is

23       everything that is being described as a threat

24       by defendants in this case.  It prohibits me

 1          from using the vast amount of confidential

 2          information that I'm going to receive from

 3          analyzing and filing another lawsuit.  That's a

 4          far greater threat than the notion of going out

 5          and acquiring hypothetical patents for a

 6          hypothetical company at some hypothetical time

 7          in the future.

 8                    But why is everybody comfortable

 9          with that?  Because I have ethical obligations,

10          and everybody who signs the undertaking has

11          those ethical obligations.

12                    The point with respect to the

13          acquisition bar is not only that it's not

14          required as stated, it's absolutely unworkable

15          as to how we're going to proceed and practice

16          law in the future, because there's nothing that

17          delineates it.  It's far too overbroad and

18          vague.

19                    But the primary point is that we

20          already have that obligation.  What the

21          defendants are referring to was not a parade of

22          horribles that are actual.  They're hypothetical

23          breaches, and if I ever breach my ethical

24          obligations, or anybody on this team does, we

```
 1        have to answer to you, Your Honor.

 2                    Now, I've never been called upon

 3        to have to do that, nor do I expect to in this

 4        case, but the obligation not to use that

 5        information, inadvertently or otherwise, is

 6        completely subsumed within paragraph two of the

 7        protective order, and that has, for my entire

 8        practice and decades, been deemed sufficient to

 9        cover the obligations of lawyers in precisely

10        these situations.

11                    I'll add, Your Honor -- and we did

12        deal with this in the letter brief.  Because

13        it's so brief, I'll simply reiterate that none

14        of the authority cited by defendants supports

15        application of the acquisition bar in this case.

16        We fully understand that Your Honor has included

17        them in certain protective orders.  We note that

18        in all but one case, the provision has not been

19        disputed.  Those provisions have also been more

20        limited in scope, in terms of their language.

21                    And finally, in the one case where

22        it was disputed, I believe it was the Alterra

23        case, which involved the Desmarais law firm, who

24        I know is very well-known to the bench in
```

```
1      Delaware, and John Desmarais changed his career
2      path a few years ago, and he got into the
3      business of actually acquiring and enforcing
4      patents himself as Round Rock Research, and so
5      there's a completely different issue there.
6      That's his business, at least part of it, and we
7      also note that ultimately, the point was
8      conceded, though initially disputed.
9                  So none of the authority cited by
10     the defendants, though they do include
11     acquisition bar, really is controlling or
12     persuasive in this case, because it's a
13     completely different situation.
14                 Finally, I note that other judges
15     have come down different ways in the District,
16     and with that before moving, Your Honor, to the
17     prosecution bar, I'd like to see if Mr. Farnan
18     has anything to add.
19                 THE COURT:  That's fine.
20                 Mr. Farnan.
21                 MR. FARNAN:  Yes, Your Honor.  May
22     I make a few points?
23                 THE COURT:  Go ahead.
24                 MR. FARNAN:  Thank you.
```

1              First, Your Honor, I think it's

2     important that there is distinguishment between

3     a prosecution bar and an acquisition bar.  The

4     purpose behind a prosecution bar is you will

5     receive information that you can then use to

6     create a right and get a patent, which is a

7     property right.

8              When it comes to acquisition bar,

9     the patents are preexisting.  You cannot create

10    a right.  They're out there, and you can't use

11    someone's information to create that right, so

12    this new push for acquisition bar, which, for

13    the most part, has been denied, stems from

14    prosecution bars, but there really is a

15    difference between the two and the purpose

16    behind them.

17             And in this case, our firm, as

18    Ms. Jacobs pointed out, what we do is we review

19    pleadings.  We assist with discovery.  We don't

20    review documents.  We don't review source code,

21    so it would be a big hardship to us, given that

22    we're in the same place as the defendants

23    looking at each other's pleadings.  That's all

24    we'll see.  So to put an acquisition bar on us

```
 1    for being in the same place they are, we think

 2    is unfair.

 3              There's another provision of the

 4    protective order, paragraph 29, which defendants

 5    propose, which gives Your Honor jurisdiction

 6    over us indefinitely for any violation of

 7    protective order.  So if there was a violation,

 8    they could bring it before Your Honor from now

 9    to the end of time, and we can deal with that,

10    and I'm sure Your Honor would deal with that

11    harshly and swiftly.  So they have protections.

12              The last point is when they say --

13    when defendants say their concern is the

14    inadvertent disclosure and you cannot

15    compartmentalize your mind and maintain that

16    duty.  Defendants, I hope, are doing that in

17    this case, and that's when they get attorney's

18    eyes only information, and they advise the

19    client.  They're able to compartmentalize, so I

20    don't see how we would not be able to do the

21    same thing.

22              So given all those factors and the

23    hardship that would be on our firm if we have an

24    acquisition bar, where there's really been shown
```

1    no risk whether we have access to the crown

2    jewels in these companies.  We would

3    respectfully that Your Honor deny the request.

4                    THE COURT:  All right.  Thank you,

5    Mr. Farnan.

6                    Mr. Akerley, do you want to move

7    on to the other issue?

8                    MR. AKERLEY:  Yes.

9                    On the prosecution bar, Your

10   Honor, to be clear, we have really, what we

11   think, bent over backwards with respect to

12   limiting what our discussions would be with IPR

13   counsel and have limited it specifically to

14   issues of claim construction and issues of the

15   prior art and its application.

16                   One thing to note, just a factual

17   issue, is that the -- the briefing that we're

18   going to submit next week, and then, of course,

19   the reply briefing, which I believe is seven

20   weeks out on Markman, is going to -- is

21   proceeding.  Not going to.  It's proceeding in

22   parallel with the IPR briefing, and of course

23   with this holdup with defendants pushing back

24   and maintaining their position on these issues

1        with the protective order, we've been held up

2        from having any meaningful discussions at all

3        with IPR counsel.

4                     And the issue is simply this.  We

5        have said we will not, will not, have any

6        discussions or be involved in any way with

7        respect to claim amendment, which, as Your Honor

8        knows, is limited in IPR's two narrowing

9        amendments, but even so, let's take that off the

10       table.  We've said, That's off limits.  We're

11       not going to talk to them about that.

12                    With respect to claim construction

13       and validity issues, I'm perplexed as to how

14       that could infect IPR counsel with respect to

15       the amendment of claims, because obviously we're

16       not going to have those discussions.  Obviously,

17       we're not going to discuss any infringement

18       positions, because we've agreed not to do that

19       as well.

20                    And the question, therefore, is

21       one of consistency, and it's a valid concern.

22       Because IPRs, unlike prior re-exam proceedings,

23       are actually nearly full-blown litigation.  You

24       take expert discovery.  Expert reports are

1    submitted and depositions are taken, and I can

2    certainly conceive of us putting something in

3    writing or an expert that may not be common to

4    the IPR proceedings saying something in a way

5    that defendants view as inconsistent with an

6    invalidity position, for instance.

7              And I know I'm going to get that

8    in your case.  They will play up the

9    inconsistency in both fora.  That's why they

10   want us not to have any communication.

11             That's really what it is.  It's no

12   communication.  We couldn't send draft briefs to

13   one another.  Our client is being deprived of

14   the benefit of, admittedly, two sets of lawyers

15   on common issues.  It's precisely how the

16   defendants are going to go through their IPRs.

17   It's their suppliers, by and large, who filed

18   these.  I can't imagine that they're not going

19   to be confirmed.  And for us, it would be

20   limited.  It's simply issues of claim

21   construction and validity.

22             What the defendants are doing are

23   conflating claim construction with amendments,

24   and by talking to IPR counsel about the prior

1    art -- and let me give you a simple example.

2               It might be that their expert, the

3    IPR counsel's expert, has a view of prior art

4    that's a little bit different from our expert;

5    right?  He might say, Look, at column three,

6    lines 15 through 20, which you guys didn't refer

7    to, you know, I think that's compelling.  And

8    one of ordinary skill in the art would not think

9    that that's an invalidating reference.

10              I can't even conceive of the harm

11   of that, but the inconsistency that might arise,

12   because different lawyers and different experts

13   view things differently, the inconsistency will

14   be used in both actions, and it shouldn't have

15   to occur, because we should be able to confer

16   with counsel on those limited issues.

17              The reason for prosecution bars

18   historically is, of course, the amendment issue

19   and whether you can use confidential information

20   to craft claims.  We said we won't have any of

21   those discussions.

22              And that's not a question of

23   inadvertent disclosure, Your Honor.  That's a

24   question of limiting the discussions to the

```
 1     extent that disclosure can't happen.  We don't
 2     think that the prosecution bar -- well, we
 3     propose limiting language for the prosecution
 4     bar.
 5               With respect to the acquisition
 6     bar, obviously we disagree with it in its
 7     entirety, and if Your Honor has any questions,
 8     I'd be happy to address them.
 9               THE COURT:  Yes, a couple.  So IV
10     has not agreed to refrain from seeking
11     amendments in these ongoing IPRs; correct?
12               MR. AKERLEY:  That's correct.
13               THE COURT:  So help me.  My
14     concern has been with this, at least potential,
15     risk of a strategic narrowing of claim scope
16     such that the claim that comes out of the IPR as
17     amended could be narrowed to a point where it's
18     stronger in terms of validity.  It's come out of
19     the IPR, in my hypothetical, but still broad
20     enough to make an infringement claim against
21     defendants.
22               MR. AKERLEY:  Yes.
23               THE COURT:  I'm -- and that
24     concern, it seems to me, is still implicated,
```

```
 1    even in the circumstance we have here, where you

 2    would not be expressly discussing amendment, but

 3    you would be expressly discussing the scope of

 4    the claims in terms of claim construction and

 5    prior art analysis.

 6              Why shouldn't I have that concern

 7    that in your mind, despite everyone's best

 8    efforts, you would know that the position you're

 9    suggesting IPR counsel take on a claim

10    construction dispute, for instance, you would

11    know, given your access to the confidential

12    information of the defendants, you would know if

13    it may ultimately lead to a claim being --

14    coming out of an IPR that would still allow you

15    to press your infringement claim.

16              MR. AKERLEY:  Your Honor, the

17    reason is that the discussions would necessarily

18    be about what we have proposed as our claim

19    construction, so there may be additional

20    argument surrounding that claim construction,

21    and that's what I'm talking about with respect

22    to consistency and making sure that there is

23    such consistency.  Getting the best value with

24    respect to the lawyers handling both proceedings
```

 1          to make these things as clear as possible.

 2                      And to the extent we would be

 3          discussing why the prior art does not overcome

 4          that claim construction, that would be the end

 5          of the discussion, because if IV and if IPR

 6          counsel decided to then amend the claims, we

 7          wouldn't be privy to that information.

 8                      So I hope I'm explaining it well

 9          enough, because I sit and I struggle with how,

10          given the restriction on that discussion and

11          given the fact that -- the one thing that

12          defense counsel is right about is that our claim

13          construction proposals, that is, what those

14          elements mean, have been proposed.

15                      Now, if we talk about those

16          proposals and why the prior art doesn't meet

17          that limitation, that could never, in my view,

18          infect how a proposed amendment would be

19          submitted, because we would never have input,

20          nor would we ever hear about the proposed

21          amendment until it's filed before the PTAB.  I

22          just don't see the risk.

23                      THE COURT:  Right.

24                      Hypothetically, IPR counsel calls

1    you up and says, I just read your -- I'm sure --

2    excellent claim construction brief.  I see

3    you've taken X, Y, and Z position.  I'm thinking

4    of taking a slightly different spin.  Here's

5    what I propose.  What do you think of that?

6              In your response to IPR counsel,

7    aren't you going to know or have some sense of

8    whether or not, if they can persuade the PTAB to

9    adopt that other construction, whether that's

10   going to help or hurt your case here?

11             MR. AKERLEY:  Well, two things.  I

12   would not know.

13             First of all, the IPR counsel

14   would have no idea what the construct of the

15   infringing devices is, so coming out of -- let's

16   just make sure it's in context; right?

17             So I'm thinking of taking a

18   slightly different spin on this.  Well, that's

19   where, to be perfectly candid with Your Honor, I

20   would say, Wait a minute a, guys.  Why aren't

21   you taking the position we've already taken?

22   Because what you're going to do is put me in

23   inconsistent positions, which is what I'm trying

24   to avoid.

1              And then we can have a candid

2       discussion about why the claim construction we

3       proposed is, in fact, correct and supportable,

4       but that's the type of discussion that we should

5       be able to have.

6                    THE COURT:  All right.

7              And on that prejudice to you from

8       the inconsistency, obviously I don't know.  I

9       can't control how the deciders, in the context

10      of the IPR, view things, but it seems to me in

11      the scope of what's going to be a very large

12      claim construction battle here, that if

13      defendants try to make much out of the fact that

14      there's an inconsistency between your position

15      and IPR counsel's position, particularly if they

16      persuaded me not to let you talk amongst each

17      other, I don't think that's going to be a very

18      persuasive argument on their behalf.

19              If that's true, is your concern

20      maybe a little bit less?

21                    MR. AKERLEY:  With respect to

22      claim construction, Your Honor, I have no doubt

23      that you would be able to make those judgment

24      calls in the right way, but we're talking about

```
 1          extended proceedings here, and the validity
 2          issues are separate from that, not in every
 3          respect a matter of law.  They're going to
 4          present these to the jury.
 5                    And, again, look, when I'm in the
 6          plaintiff's role, as -- and I have multiple
 7          defendants, I consider it a lucky day when there
 8          are inconsistencies among defendants' positions,
 9          because there's something persuasive about that.
10          If you're dealing with, as we would be
11          ultimately and at least potentially, dealing
12          with inconsistency between IV's own counsel, if
13          I'm a juror listening to this case, ultimately,
14          that's very persuasive, and that's a real risk.
15                    THE COURT:  What about the
16          questions whether the prosecution bar should
17          relate to field or subject matter?  Can you
18          comment on that?
19                    MR. AKERLEY:  Yeah.  It should be
20          the subject matter of the patents in suit,
21          because the field is, again, undefined.  It's
22          the same issue with using that term in the
23          acquisition bar.
24                    So, you know, we're dealing with
```

```
1    16 patents.  Some of them are very specific, but

2    a particular way of encoding over-air signals in

3    a CDMA network, for instance.  Very, very

4    particular way and very, very particular

5    requirement, but to say that -- the field of

6    technology could be read to be any CDMA

7    technology.  That's our problem with that, Your

8    Honor.

9              THE COURT:  All right.  Thank you.

10             Ms. Jacobs, very briefly, if you

11   want to respond, you may.

12             MS. JACOBS:  Yes.  Thank you, Your

13   Honor.  Just a few points.

14             And I want to highlight a little

15   more because Your Honor started asking the

16   question about what about confidential

17   information between codefendants.  I just want

18   to make a few more points about that that have

19   been pointed out to me.

20             Defendants are not only not

21   producing each other's documents to each other,

22   the infringement contentions are served on each

23   defendant and not shared.  We fully expect the

24   expert reports will be in each case.
```

```
 1                  That's particularly why

 2      defendants -- you may recall, Your Honor, that

 3      we moved to sever, particularly because we are

 4      competitors and are very sensitive to

 5      confidential information of each other, and in

 6      the protective order that's proposed itself,

 7      there's an agreed-upon provision that plaintiff

 8      shall not disclose any confidential information

 9      of one defendant to another defendant without

10      first obtaining written permission to make such

11      disclosure.

12                  The cases will be tried

13      separately, so that's particularly the concern,

14      that the defendants have gone to great pains not

15      to share confidential information to each other,

16      and they're not in the business of suing each

17      other.  Not saying that it never happens or

18      could never happen, but it's certainly a

19      different level of concern.

20                  The second point I'll make, Your

21      Honor, is I want to just pick up on the

22      hypothetical that you posed as to what could

23      happen in a conversation between litigation

24      counsel and IPR counsel.  If the question were,
```

```
 1        What do you think about -- this is the argument
 2        we're thinking about making on this piece of
 3        prior art.  The concern we would have is the
 4        response could be -- and I'm not saying this
 5        would be expressly done, because, again, we're
 6        not questioning the ethics of counsel, but the
 7        concern is that litigation counsel would know,
 8        no, you can't make that argument, because if you
 9        make that argument, then that's going to
10        interfere -- you're going to be giving up
11        something that would interfere with our
12        infringement read.
13                 And, again, we would assume that
14        would not be an express discussion, but that
15        would almost certainly pervade the understanding
16        of why a certain position couldn't be taken, and
17        that would be the concern that we have.
18                 In terms of the concern about
19        inconsistency, as I say, they will have the
20        materials, but of course we need to remember, as
21        well, that claim construction standards are
22        different in District Court than in the PTO.
23                 So beyond the comments that Your
24        Honor already made about not putting a lot of
```

1      weight into inconsistencies, we also have

2      different standards being applied in both

3      forums.

4                    Thank you, Your Honor.

5                    THE COURT:  Okay.  Thank you.  Let

6      me give you my rulings on the two issues.  I'll

7      talk first about the proposed acquisition bar.

8                    Here, the defendants' proposal is

9      rejected.  The plaintiff's alternative proposal

10     in their letter is adopted and should be

11     included in the protective order presented to me

12     for my signature.

13                   I, of course, reviewed everything

14     carefully before the call and listened with

15     great interest to both sides' arguments on the

16     issue, and I just, at the end, continue to, in

17     this case, share the plaintiff's concerns about

18     the ambiguity and the breadth of what the

19     defendants have proposed.

20                   I understand defendants have

21     engaged in an iterative process and narrowed

22     from where they started, and I appreciate that.

23     That's as it should be, but I think we still

24     ended up in a place that is still too ambiguous

```
 1     and too broad here and really does risk having a

 2     profound and negative and ultimately, I think,

 3     unwarranted impact on plaintiff's counsel and

 4     their ability to practice in this area in future

 5     cases with other clients.

 6             The risk, in my mind, of the

 7     inadvertent use of defendants' confidential

 8     information to advise IV or any other client on

 9     the acquisition of patents that might then be

10     asserted against defendants is just too

11     attenuated a risk.  Notwithstanding what I

12     understand about the business model, I just

13     nonetheless think that risk is too attenuated to

14     justify the imposition of the vague and broad

15     preclusion on plaintiff's counsel here.

16             And there I do continue,

17     notwithstanding the very persuasive comments

18     made by Ms. Jacobs.  Nonetheless, I can't shake

19     this sense that if the defendants are -- are

20     fully and entirely as concerned with this risk

21     as they are positing, that they wouldn't want to

22     bind one another's counsel to something like

23     what they have proposed to bind plaintiff's

24     counsel to.
```

```
 1                    I recognize all the protections

 2         that have been taken in the course of this case

 3         and the effort to sever the cases and all that

 4         in an effort to protect defendants from one

 5         another, but it just seems to me it is, if not

 6         as likely, still likely enough that competitors,

 7         such as the defendants are, might in the

 8         future -- and we're talking about a provision

 9         with no time limit on it -- may come to acquire

10         a patent that they wish to assert against one of

11         their now codefendants in this case, and the

12         idea that defendants' counsel would be free to

13         advise their client to do that in a way that

14         plaintiff's counsel is not just doesn't seem

15         warranted to me under the circumstances here.

16                    And the only other thing I would

17         add is, of course I don't think that there's any

18         binding authority on this point.  I'm asked to

19         make a discretionary case-by-case decision.  I

20         looked at what Judge Robinson and Judge Andrews

21         have done, as was cited in the papers.  I was

22         reminded, of course, what I had done in the IV

23         versus Alterra case, and all I can say there is

24         my recollection is in that earlier case it
```

1    wasn't -- it really wasn't the focus of what was

2    in dispute, in my mind at least in that case.

3    And I've had occasion in this case to think it

4    through much more carefully, and I think I've

5    reached the right decision in this case.

6                    Finally, on the question of the

7    prosecution bar, here I am going to adopt the

8    plaintiff's proposal.  I still do have this

9    concern about the risk of strategic narrowing

10   amendments, even in the context of a post-grant

11   review here in IPR, and I just think that there

12   is -- even under the circumstances here, there

13   is a risk that those conversations that

14   litigation counsel wish to have the freedom to

15   have with IPR counsel could be informed by

16   confidential information of defendants that

17   litigation counsel have had access to, which

18   could ultimately lead to that type of strategic

19   narrowing that I am concerned with.

20                   And so I think there is that risk,

21   and I think that warrants the protection that

22   the defendants have proposed.

23                   And on the other side of the

24   ledger, I don't -- I don't think what I'm doing

```
 1        is really going to be, at the end of the day,

 2        particularly unfair or prejudicial to the

 3        plaintiffs.  Given the timing, as I understand

 4        it, IPR counsel will have the opportunity to

 5        review the claim construction briefing filed in

 6        this court, and at least in the context of claim

 7        construction, I really don't think defendants

 8        will get very much traction by pointing out to

 9        me that two sets of intelligent lawyers looking

10        at the same patents and the same prior art maybe

11        came to somewhat different claim construction

12        positions, just as it may be that among the many

13        defendants here, that they don't all uniformly

14        have the same claim construction position.

15                I saw the letter on the ten most

16        significant terms.  Not every defendant agreed

17        on that.  I just don't see that having a whole

18        lot of weight in the context of claim

19        construction, and should these cases get to

20        trial, if plaintiffs want to ask me to keep the

21        jury from hearing that two sets of plaintiff's

22        counsel came to different conclusions, I'll

23        certainly be willing to consider keeping that

24        fact, if it happens, from the jury.
```

1           The only other thing, in terms of

2    the scope of the prosecution bar, I will,

3    however, go with the plaintiff's narrower

4    proposal there, so what you send to me should

5    talk about the scope being limited to the

6    subject matter and not the whole field.

7           Any questions about what I have

8    ruled here, Ms. Jacobs?

9           MS. JACOBS:  Yes, Your Honor.  Two

10    small questions.

11           On the issue of the prosecution

12    bar, I think Your Honor started out by saying

13    you were adopting plaintiff's proposal, but from

14    your comments, I assume you're referring to

15    defendants' proposal, but I just wanted to be

16    clear on that.

17           THE COURT:  On the prosecution

18    bar, yes, I meant defendants' proposal with the

19    exception of the field, so I apologize and thank

20    you for pointing that out.

21           MS. JACOBS:  The only other

22    clarification, Your Honor, is on the acquisition

23    bar.  I think you said that you were adopting

24    the plaintiff's proposal in their letter.

```
 1              I just want to point out that what

 2      is in the letter is different from the proposal

 3      in the protective order that was attached to the

 4      letter.  We have no problem with the provision

 5      that was in the attached protective order.

 6      What's in the letter is a two-way acquisition

 7      bar, which we don't think makes any sense.  In

 8      light of the circumstances here, I don't think

 9      there was really an argument why it should be

10      two-way.

11              So we don't have a problem with

12      including the acquisition bar that was proposed

13      in the protective order as IV's proposal, and

14      that's on page 29, but I just want to be clear

15      so we don't have a further dispute about it.

16              THE COURT:  All right.  Let me ask

17      Mr. Akerley.  Do we have a dispute on that?

18              MR. AKERLEY:  Well, there's no

19      real dispute except that the provision that we

20      proposed is in the letter.  There's an error in

21      the attachment, which I'm unclear as to how it

22      got in.  It was a different proposal, but what

23      we presented to Your Honor for consideration is

24      the proposal that I believe you were referring
```

```
 1     to at page two of the letter.  That is what we

 2     meant.

 3               THE COURT:  All right.  That is

 4     what I had reviewed, and that is what I am

 5     ordering, is that proposal, the alternative

 6     proposal from the plaintiffs at page two of

 7     their letter.

 8               Anything else, Ms. Jacobs?

 9               MS. JACOBS:  And I guess with that

10     clarification, then I guess with page two,

11     shouldn't it be a one-way bar?  I don't think

12     there was any argument that an acquisition bar

13     needs to be two-way, so what we understand -- we

14     would go with this proposal, but I guess I'd

15     like the clarification as to whether it's a

16     one-way or two-way bar.

17               THE COURT:  Mr. Akerley, do you

18     intend it to be a two-way bar?

19               MR. AKERLEY:  That is the way we

20     proposed it, Your Honor, and it was the way

21     intended, and I think that it was clear, and

22     it's set forth right there.

23               THE COURT:  And, Mr. Akerley, do

24     you think we have a record to justify a bar on
```

```
1    the defendants?
2              MR. AKERLEY:  In what way, Your
3    Honor?  I'm not clear.  Because of the
4    relationship between the parties?
5              THE COURT:  All right.  You all
6    are going to have to do further work on this
7    because I'm holding another set of attorneys up
8    by 15 minutes.
9              Ms. Jacobs, I'll come back to this
10   question and tell you how to proceed, but
11   anything else you wanted to ask?
12             MS. JACOBS:  No, Your Honor.  Just
13   this issue.
14             THE COURT:  Okay.  Anything other
15   than that from any other defendant?
16             Okay.  And, Mr. Akerley, other
17   than this issue, anything that you wanted to
18   ask?
19             MR. AKERLEY:  Your Honor, the only
20   thing that I want to say, and simply because it
21   did not come up in our discussion when we turned
22   to plaintiffs, and that is that we also are not
23   familiar with Judge Robinson's recent use of an
24   intermediary, and I know you've ruled, and I'm
```

1    not asking you to reconsider that, but if you

2    were inclined to go that way, it would be

3    preferable to Intellectual Ventures.

4               THE COURT:  No, I have already

5    ruled, and just for the record so you all can

6    find the case, I was presented with a case

7    called *Versata Software versus Callidus*

8    *Software*.  It's an opinion of hers from March of

9    this year.  That's what I was referring to.

10              In terms of the acquisition bar, I

11   guess you all should talk further.  I was

12   hoping -- you know, I don't think the

13   acquisition bar is warranted, and it was in that

14   context that I thought the way to achieve that,

15   misguidedly, was to go with the plaintiff's

16   alternative proposal, so I think probably the

17   logic of it not being warranted is that it's

18   certainly not warranted on both sides.

19              But let me have you put your heads

20   together and get me a joint letter tomorrow

21   telling me whether, given the fact that I'm

22   rejecting the defendants' proposal, whether I

23   should adhere to what I have said, which is I'll

24   go with the plaintiff's alternative two-way

1      proposal, or whether I should just not have any

2      acquisition bar at all.  So you all meet and

3      confer on that and let me know your positions by

4      joint letter tomorrow.

5                      Any questions on that, Ms. Jacobs?

6                      MS. JACOBS:  No, Your Honor.

7      Thank you.

8                      THE COURT:  And any questions from

9      Mr. Akerley?

10                     MR. AKERLEY:  No, Your Honor.

11     Thank you.

12                     THE COURT:  All right.  Thank you

13     all very much.

14                     (THEREUPON, the proceeding ended at

15     2:30 p.m.)

16

17

18

19

20

21

22

23

24

```
1              C E R T I F I C A T E

2    STATE OF DELAWARE   )
                         )    ss:
3    COUNTY OF NEW CASTLE)

4

5         I, Deanna L. Warner, a Certified Shorthand

6    Reporter, do hereby certify that I was present at and

7    reported in shorthand the foregoing proceedings had

8    at the aforementioned time and place; further, that

9    the foregoing 56 pages is a true and correct

10   transcript of my notes requested transcribed.

11

12

13

14
                        _____
15                      Deanna L. Warner
                        CERTIFIED SHORTHAND REPORTER
16                      Registration No. 1687

17

18

19

20

21

22

23

24
```

# EXHIBIT D

Case 1:14-cv-00365-LPS-CJB Document 64-4 Filed 06/01/15 Page 101 of 113 PageID #:
Case 1:14-cv-00365-LPS-CJB Document 24-1 Filed 12/10/14 Page 9 of 41 PageID #:
307



1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000
www.potteranderson.com

**Richard L. Horwitz**
Partner
Attorney at Law
rhorwitz@potteranderson.com
302 984-6027 Direct Phone
302 658-1192 Fax

December 10, 2014

## VIA ELECTRONIC FILING

The Honorable Leonard P. Stark
J. Caleb Boggs Federal Building
844 N. King Street, Unit 26, Room 6124
Wilmington, DE 19801-3555

   **Re:**   *Copy Protection LLC v. Netflix, Inc.*, C.A. No. 14-365-LPS

Dear Chief Judge Stark:

A dispute has arisen between Netflix, Inc. ("Netflix") and Copy Protection LLC ("Copy Protection" or "Plaintiff") as to whether the Protective Order in this matter should include a provision that prevents any person who receives highly confidential material from participating in the acquisition of patents relating to the subject matter of this litigation (referred to as an "acquisition bar").  Netflix believes that such a provision is reasonable and necessary because, on the particular facts of this case, patent acquisition is an act of competitive decisionmaking.

Factual background.  Copy Protection is a non-practicing entity whose business is to monetize U.S. Patent No. 7,079,649.  Copy Protection is owned by Wi-LAN Inc. ("WiLAN"), which is a large intellectual property licensing company that is in the business of acquiring and enforcing patents.  *See*, *e.g.*, Wi-LAN Inc. 2014 Third Quarter Unaudited Condensed Consolidated Financial Results Interim Report 5 (http://wilan.com/files/documents_financial/2014/WIN_Q3_2014_Financial_Statements_and-Notes_Final_v001_f47i2s.pdf) (last visited Dec. 10, 2014). WiLAN's most recent publically available financial report provides further insight into its business practices: "In connection with the acquisition of certain patents and patent rights, the Company has agreed to future additional payments to the former owners of the respective patents or patent rights, based on future revenues . . . generated as a result of licensing the respective patents or patent portfolios."  *Id.* at 7.

Against this background, on October 13, 2014, Netflix proposed a Protective Order that included an acquisition bar and, after exchanging multiple drafts, on October 27, 2014 ***both*** parties agreed on a proposed Protective Order for this matter that included an acquisition bar.  Copy Protection's lead counsel confirmed that their client had approved the Protective Order and offered to file it that day, the day it was due to be submitted to the court.  (Ex. A.)  However, later that same day, Plaintiff's lead counsel alerted Netflix that Plaintiff's Delaware counsel would not agree to the acquisition bar for reasons unrelated to this case, and not on the basis of its impact on the parties to the case, but rather on its impact on future potential clients.  After Netflix agreed to an extension of time to allow Plaintiff to reconsider the issue, Plaintiff's

The Honorable Leonard P. Stark
December 10, 2014
Page 2

Delaware counsel confirmed by email that they would not agree to an acquisition bar. (Ex. B.) The only concern cited in the email was that the acquisition bar "will later be cited against clients in other cases as an example of a bar being imposed." (*Id.*)

The relevant provision reads:

> Absent the written consent of the Producing Party, any person on behalf of the Plaintiff who receives one or more items designated "CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY – SOURCE CODE" by a Defendant shall not be involved, directly or indirectly, in any of the following activities: . . . (ii) the acquisition of patents (including patent applications), or the rights to any such patents or patent applications with the right to sublicense, relating to the subject matter of the litigation.

The Protective Order limited the acquisition bar to a period of two years after resolution of the action, and narrowly tailored application of the prosecution bar to attorneys only: "These prohibitions apply only to the attorneys that receive such materials, and shall not apply to staff, paralegals, or be imputed to the firms."

Counsel for the parties held a teleconference on October 29, 2014 in an attempt to resolve this dispute. At that conference, counsel for Copy Protection for the first time expressed a concern that acquisition bars act as a "restraint on trade" for lawyers and would impede the lawyers' ability to help acquire patents for future clients. Netflix's counsel suggested that if the bar was too restrictive, Copy Protection's counsel should propose changes, which they agreed to do. They later reversed course, taking the position that they would not agree to any acquisition bar, no matter the scope.

Legal Standard. The Federal Circuit has outlined the law governing prosecution bars in patent cases in *In re Deutsche Bank Trust Co. Ams.*, 605 F.3d 1373 (Fed. Cir. 2010) and *In re Sibia Neurosciences, Inc.*, No. 525, 1997 WL 688174 (Fed. Cir. Oct. 22, 1997) (Table). While aimed at different phases of the patent acquisition process (prosecuting new patents versus buying old ones), the concern underlying both prosecution and acquisition bars is the same. Fundamentally, "[i]nvolvement in 'competitive decisionmaking' serves as the basis for denial of access" to sensitive material. *Sibia*, 1997 WL 688174, at *2.

Although a general provision that confidential information may be used for the purposes of the current litigation will sometimes be sufficient, *Deutsche Bank*, 605 F.3d at 1378, "there may be circumstances in which even the most rigorous efforts of the recipient of such information to preserve confidentiality in compliance with the provisions of such a protective order may not prevent inadvertent compromise" because " 'it is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so.' " *Id.* (quoting *FTC v. Exxon Corp.*, 636 F.2d 1336, 1350 (D.C. Cir. 1980). The risk of inadvertent disclosure or use must be determined on the facts of the specific case "on a counsel-by-counsel basis," and the "determination should turn on the extent to which counsel is involved in 'competitive decisionmaking' with its client." *Id.* at 1378. In the related context of a prosecution bar, the Federal Circuit recognizes that patent prosecution can be

The Honorable Leonard P. Stark
December 10, 2014
Page 3

the type of competitive decisionmaking that triggers a specific bar to sensitive information. *Id.* at 1380.

<u>Netflix's Position</u>. Netflix has a legitimate interest in preventing attorneys who receive its confidential information from participating in patent acquisition related to the subject matter of this litigation because, on the facts of this case, ***patent acquisition is competitive decisionmaking***. Copy Protection (and the corporate group to which it belongs) may not be a competitor to Netflix in the traditional sense that it offers competing products in the marketplace, but its routine course of business is adverse to Netflix even more directly. As a non-practicing entity, Copy Protection's business consists of acquiring and enforcing patent rights against targeted companies. As evidenced by this very action, Netflix is such a targeted company. Indeed, as recently explained by Special Master Lukoff, when the party receiving confidential information is a non-practicing entity, "it is difficult to envision circumstances in which the inadvertent disclosure of highly confidential information would not be a risk about which to be concerned when the issue being discussed is the future acquisition of patents." *Inventor Holdings, LLC v. Google, Inc.*, C.A. No. 14-186-GMS, 2014 WL 4369504, at *1 (D. Del. Aug. 27, 2014) (emphasis omitted). This rationale applies strongly in this case where the corporate group to which Copy Protection belongs readily avows that its core business is the acquisition and enforcement of patents.

The acquisition bar proposed by Netflix (and initially accepted by Copy Protection) minimizes the burden it imposes to protect Netflix's legitimate interest. The provision is limited in three important aspects: First, it applies only to those attorneys who actually review highly confidential information. Second, the bar cannot be imputed to other lawyers in the receiving firm or to non-attorney staff. Third, and contrary to bars rejected by this Court, this bar applies only for a limited period of two years following resolution of this litigation. *See* Transcript of Telephone Conference at 48 *Intellectual Ventures II LLC v. T-Mobile USA Inc.*, C.A. No. 13-1633-LPS (D. Del. June 13, 2014), D.I. 110 (rejecting bar "with no time limit"). The bar applies only to prevent individuals who actually receive sensitive information from participating specifically in an act that is, by virtue of Plaintiff's business, competitive decisionmaking. Nor would entry of this acquisition bar harm Copy Protection because "the acquisition of additional patents is an exercise where the plaintiff can rely upon counsel other than any who have seen highly-protected materials." 2014 WL 4369504, at *2.

Whereas a general threat of inadvertent misuse of discovered information is properly addressed by a general provision in the Protective Order, Netflix's specific concern should be addressed directly by a narrowly tailored provision that specifically prevents the tangible risk of injury: that attorneys who discover highly confidential details about Netflix's systems later participate in selecting patents that may be asserted against Netflix. Accordingly, Netflix respectfully requests that the Court enter a Protective Order containing the acquisition bar as drafted.

Respectfully,

*/s/ Richard L. Horwitz*

Richard L. Horwitz

The Honorable Leonard P. Stark
December 10, 2014
Page 4

RLH:nmt/1174773/41572

Enclosures
cc:      Clerk of the Court (via hand delivery)
         Counsel of Record (by electronic mail)

# EXHIBIT A

| From: | Eckenthal, Aaron S. <AEckenthal@ldlkm.com> |
|---|---|
| Sent: | Monday, October 27, 2014 7:56 AM |
| To: | Roth, Stephen F; Rozier, Matt |
| Cc: | rhorwitz@potteranderson.com; Oakley, Aaron S.; James, Clay C.; Fuller, Maegan A; Daniels-Riley, Mona |
| Subject: | RE: Copy Protection: Protective Order |
| Attachments: | Copy Protection v  Netflix Protective Order (FINAL 2014-10-27).docx |

Matt:

Our client gave us approval on the final version.  I accepted all the changes in the attached document.  Please let us know if you would like us to file it.

Regards,
Aaron

**From:** Roth, Stephen F
**Sent:** Friday, October 24, 2014 4:15 PM
**To:** 'Rozier, Matt'; Eckenthal, Aaron S.
**Cc:** rhorwitz@potteranderson.com; Oakley, Aaron S.; James, Clay C.; Fuller, Maegan A; Daniels-Riley, Mona
**Subject:** RE: Copy Protection: Protective Order

Matt:

The agreement looks good, but I just need to get my client's approval on the final version.  We should be able to get this done on Monday.

Stephen.

**From:** Rozier, Matt [mailto:matt.rozier@hoganlovells.com]
**Sent:** Tuesday, October 21, 2014 7:24 PM
**To:** Eckenthal, Aaron S.; Roth, Stephen F
**Cc:** rhorwitz@potteranderson.com; Oakley, Aaron S.; James, Clay C.; Fuller, Maegan A; Daniels-Riley, Mona
**Subject:** RE: Copy Protection: Protective Order

Aaron,

Attached is a copy of the proposed Protective Order with some additional changes from us.  We worked off the redline copy you sent us.

The biggest changes deal with 6(b).

Let us know if you think a call would be helpful in resolving some our disagreements on this.

Matt

**Matt Rozier**
Associate

1

Case 1:14-cv-00941-PEC-GJB Document 26-1 Filed 04/01/15 Page 107 of 112 PageID #:
Case 1:14-cv-00365-LPS Document 26-1 Filed 12/10/14 Page 3 of 8 PageID #: 121
313

Hogan Lovells US LLP
One Tabor Center, Suite 1500
1200 Seventeenth Street
Denver, CO 80202

Tel:      +1 303 899 7300
Direct:  +1 303 454 2543
Fax:      +1 303 899 7333
Email:   matt.rozier@hoganlovells.com
            www.hoganlovells.com

*Please consider the environment before printing this e-mail.*

**From:** Eckenthal, Aaron S. [mailto:AEckenthal@ldlkm.com]
**Sent:** Thursday, October 16, 2014 10:14 AM
**To:** Rozier, Matt; Roth, Stephen F
**Cc:** rhorwitz@potteranderson.com; Oakley, Aaron S.; James, Clay C.; Fuller, Maegan A; Daniels-Riley, Mona
**Subject:** RE: Copy Protection: Protective Order

Matt,

Attached is a redlined copy of the proposed Protective Order. The biggest change we made to the Protective Order pertains to the handling and review of source code. There is a Default Standard for Access to Source Code in the District of Delaware, which we inserted into that section in lieu of what was there. We believe that because this is the standard in Delaware, it should be the starting point for this section. Thus, we modified the Default Standard slightly, mainly to conform with the language used in the Protective Order.

With respect to an extension of time, if you believe that the changes we proposed require an extension of time from the October 20th date, we have no issue with seeking an extension. In that regard, we already agreed to an extension of time for the Rule 26 disclosures, and while we do not believe anything needs to be filed with the Court to extend the time to exchange Rule 26 disclosures we will check with our local counsel regarding any filing with the Court to extend the time for both the Rule 26 disclosures and the Protective Order.

Regards,
Aaron

**From:** Rozier, Matt [mailto:matt.rozier@hoganlovells.com]
**Sent:** Wednesday, October 15, 2014 4:41 PM
**To:** Eckenthal, Aaron S.; Roth, Stephen F
**Cc:** rhorwitz@potteranderson.com; Oakley, Aaron S.; James, Clay C.
**Subject:** RE: Copy Protection: Protective Order

Aaron and Stephen,

Just a friendly reminder on the draft protective order we sent on Monday (also attached to this email). It's due next Monday, October 20th, so if you anticipate any substantial issues with our draft we will probably need to file for an extension in the next couple of days.

Regards,

Case 1:14-cv-00924-PEGJB Document 26-1 Filed 01/01/15 Page 108 of 112 PageID #:
Case 1:14-cv-00365-LPS Document 26-1 Filed 12/10/14 Page 4 of 8 PageID #: 122
314

Matt

**Matt Rozier**
Associate

**Hogan Lovells US LLP**
One Tabor Center, Suite 1500
1200 Seventeenth Street
Denver, CO 80202

Tel:    +1 303 899 7300
Direct:  +1 303 454 2543
Fax:    +1 303 899 7333
Email:  matt.rozier@hoganlovells.com
       www.hoganlovells.com

*Please consider the environment before printing this e-mail.*


**From:** James, Clay C.
**Sent:** Monday, October 13, 2014 10:02 AM
**To:** Eckenthal, Aaron S. (AEckenthal@ldlkm.com); sroth@ldlkm.com
**Cc:** rhorwitz@potteranderson.com; Oakley, Aaron S.; Rozier, Matt
**Subject:** Copy Protection: Protective Order

Aaron and Stephen,

A draft protective order is attached for your review.  Under the current schedule, it is due next week, so if you anticipate a lengthy review or negotiation process, we might want to consider asking for a short extension.



**Clay James**
Partner

**Hogan Lovells US LLP – Silicon Valley Office**
4085 Campbell Ave, Suite 100
Menlo Park, CA 94025

Tel:    +1 650 463 4000
Direct:  +1 650 463 4039
Fax:    +1 650 463 4199

**Hogan Lovells US LLP – Denver Office**
One Tabor Center, Suite 1500
1200 Seventeenth Street
Denver, CO 80202

Tel:    +1 303 899 7300
Direct:  +1 303 454 2486
Fax:    +1 303 899 7333
Email:  clay.james@hoganlovells.com
       www.hoganlovells.com

*Please consider the environment before printing this e-mail.*

**About Hogan Lovells**
Hogan Lovells is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP. For more information, see www.hoganlovells.com.

CONFIDENTIALITY. This email and any attachments are confidential, except where the email states it can be disclosed; it may also be privileged. If received in error, please do not disclose the contents to anyone, but notify the sender by return email and delete this email (and any attachments) from your system.

Case 1:14-cv-00942-LPS-CJB Document 34-1 Filed 04/01/15 Page 110 of 112 PageID #:
Case 1:14-cv-00365-LPS Document 26-1 Filed 12/10/14 Page 6 of 9 PageID #: 124
316

# EXHIBIT B

## Horwitz, Richard L.

| | |
|---|---|
| **From:** | Michael J. Farnan [mfarnan@farnanlaw.com] |
| **Sent:** | Tuesday, October 28, 2014 2:35 PM |
| **To:** | Horwitz, Richard L. |
| **Cc:** | Brian E. Farnan |
| **Subject:** | RE: Copy Protection v. Netflix Protective Order |
| **Attachments:** | 7 1 14 GPH v. Asus, Google, et al.pdf |

Hi Rich,

There has been a surge by defendants to impose acquisition bars in cases which the Court has uniformly rejected.  We cannot agree to a bar here that will later be cited against clients in other cases as an example of a bar being imposed.  Attached is the most recent transcript (that we are aware of) from Judge Stark on this issue.   Please let us know if defendant is willing to eliminate the acquisition bar from the PO.  Thank you

-Michael

Michael J. Farnan
Farnan LLP
919 N. Market St.
12th Floor
Wilmington, DE 19801
Direct Dial:  302-777-0338
Fax:  302-777-0301

**From:** Michael J. Farnan
**Sent:** Monday, October 27, 2014 2:52 PM
**To:** 'Horwitz, Richard L.'
**Cc:** Brian E. Farnan
**Subject:** RE: Copy Protection v. Netflix Protective Order

Hi Rich,

Attached is the stipulation.  Let me know if we can sign for you.  Thank you.

-Michael

Michael J. Farnan
Farnan LLP
919 N. Market St.
12th Floor
Wilmington, DE 19801
Direct Dial:  302-777-0338
Fax:  302-777-0301

**From:** Horwitz, Richard L. [mailto:rhorwitz@Potteranderson.com]
**Sent:** Monday, October 27, 2014 2:19 PM
**To:** Michael J. Farnan
**Cc:** Brian E. Farnan
**Subject:** Copy Protection v. Netflix Protective Order
**Importance:** High

Michael – I just left you a voicemail.  Please call me asap about the protective order, which is due today.  We thought we had an agreement, but apparently you guys have now raised an issue with an acquisition bar provision.

Rich

Richard L. Horwitz
Partner
**Potter Anderson & Corroon LLP**
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951
302 984 6027 Direct Dial
302 658 1192 Fax
**rhorwitz@potteranderson.com**
**www.potteranderson.com**

Potter Anderson & Corroon LLP is not providing any advice in this communication with respect to any federal tax matters.

THIS ELECTRONIC MAIL TRANSMISSION AND ANY ATTACHMENTS MAY CONTAIN PRIVILEGED, CONFIDENTIAL, OR PROPRIETARY INFORMATION INTENDED ONLY FOR THE PERSON(S) NAMED. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE AUTHORIZED REPRESENTATIVE OF THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISTRIBUTION, COPYING, OR DISCLOSURE OF THIS COMMUNICATION IS STRICTLY PROHIBITED.